BALMER, J.
**39 These juvenile dependency cases, which we consolidated for review, concern the permanency plans for two children and half-siblings, L and A, under the jurisdiction of the juvenile court. The Department of Human Services (DHS) arranged for the children to be placed in relative foster care with their maternal aunt. The juvenile court held a permanency hearing in accordance with statutory timelines after L had been in relative foster care for about 15 months and A for about 12 months. At the hearing, DHS asked the juvenile court to change the permanency plans for the children from reunification to adoption. The juvenile court did so, but the Court of Appeals reversed, in two separate opinions. Dept. of Human Services v. S.J.M. , 283 Or. App. 367, 388 P.3d 417 (2017) ( S.J.M. I ) (regarding A); Dept. of Human Services v. S.J.M. , 283 Or. App. 592, 388 P.3d 1199 (2016) ( S.J.M. II ) (regarding L). DHS sought review, asserting that the Court of Appeals had erroneously interpreted the statutes pertaining to changing permanency plans for children within the jurisdiction of the juvenile court.
The legal question that this case presents requires some context. The statute prescribing how permanency hearings are to be conducted, ORS 419B.476, contains a cross-reference to a statute regarding termination of parental rights, ORS 419B.498. The latter statute requires DHS to file a petition to terminate parental rights in certain circumstances including, as relevant here, when a child "has been in substitute care under the responsibility of [DHS] for 15 of the most recent 22 months." ORS 419B.498(1)(a). But subsection (2) provides an exception to that statutory deadline for filing a termination petition if there is a "compelling reason, which is documented in the case plan, for determining that such a petition would not be in the best interests of the child." ORS 419B.498(2)(b). That "escape clause" is referred to in the permanency statute, which provides that, if the juvenile court determines that a child's permanency plan should be changed to adoption, the court must make a "determination of whether one of the circumstances in ORS 419B.498(2) is applicable." ORS 419B.476(5)(d).
In these cases, the Court of Appeals held that, if a "compelling reason" exists, the permanency plan cannot **40 be changed to adoption. S. J. M. I , 283 Or. App. at 389-92, 388 P.3d 417. Neither party sought review of that holding. But the Court of Appeals also concluded that DHS, the party seeking to change the plans to adoption in this case, had failed to prove that a "compelling reason" did not exist. Id. at 392-94, 388 P.3d 417. Thus, the issue before us is whether DHS had the burden of proving the absence of a "compelling reason" or whether those opposing the change of plan had the burden of proving the existence of a "compelling reason" to defer filing a petition to terminate parental rights. Put differently, the issue could be described as what the juvenile court should do when *1023 the evidence in the record does not show that a "compelling reason" exists, but when the party seeking to change the plan to adoption did not disprove the existence of a "compelling reason." The Court of Appeals held that the absence of evidence in the record concerning a "compelling reason" was a deficiency in DHS's proof that precluded a change of plan. S. J. M. I , 283 Or. App. at 394, 388 P.3d 417. DHS sought review of that determination in this court.
As explained below, we agree with DHS that the Court of Appeals incorrectly construed the statutory requirements at issue. Because DHS met its burden to show that the requirements in ORS 419B.476 for changing the permanency plans away from reunification had been met, it was parents' burden, as the parties seeking to invoke the escape clause, to show that there was a "compelling reason" under ORS 419B.498(2) for DHS not to proceed with petitions to terminate parental rights. We also reject parents' arguments that evidence in the record did not support the trial court's findings in these cases. Accordingly, we reverse the decisions of the Court of Appeals and affirm the judgments of the juvenile court.
We review the juvenile court's legal conclusions for errors of law, and we view the evidence in the light most favorable to the court's disposition to determine if it supports the court's legal conclusions. ORS 419B.476(8) ; ORS 419A.200 ; ORS 19.415.[1]
**41 FACTUAL BACKGROUND
These cases concern mother and her children, L and A, and the father of A, AJB.[2] L was born in 2011 and has several developmental disabilities. In 2013, mother and L began living with AJB. In September 2014, DHS became involved because of a neighbor's report that AJB had struck L as discipline for playing with a knife, which resulted in significant bruising. DHS learned that AJB had "beat[en] [L] on his behind four times." Mother and AJB initially maintained to investigators that L had been injured falling on the stairs. After several weeks, however, they acknowledged that AJB had hit and injured L.
In October 2014, DHS petitioned the juvenile court to take jurisdiction over L. The juvenile court held a shelter hearing and issued an order taking L into protective custody and placing him with his maternal aunt and her partner. In November 2014, mother gave birth to A, and DHS immediately filed a petition for the court to take jurisdiction over A as well.
The juvenile court took jurisdiction over both L and A in December 2014 based on findings, substantially the same in both cases, that mother lacked the parenting skills to parent either child safely and that mother was aware that AJB was physically abusive toward L, but had failed to protect the child from additional physical abuse. With respect to A's father, AJB, the court found that he lacked the skills to parent A, that he had physically abused A's half-sibling L, and that his mental health condition interfered with his ability to parent. The court made factual findings that supported several of the state's allegations set out above. The court ordered the primary case plans to be reunification of L with mother and of A with mother and AJB, and the concurrent case plans to be adoption. The court instructed mother to complete a psychological evaluation and to obtain services recommended by the evaluator; to participate in and to cooperate in counseling; to participate in and successfully **42 to complete a parent training program; and to maintain safe and stable housing as approved by DHS. The court instructed AJB to meet the same conditions.
In December 2014, the juvenile court placed both children in the legal custody of DHS. L was already in relative foster care with his maternal aunt, and A was ultimately *1024 placed there as well. Following the December 2014 order, mother engaged in supervised visits with L and A. AJB participated in supervised visits with A. Mother and AJB also attended and completed parenting programs.
In June 2015, mother married AJB. Mother and AJB did not disclose the marriage to DHS or at a subsequent court hearing, and mother denied the marriage until confronted by DHS. Mother continued to live with AJB, although she knew that it would make it more difficult for her to have L and A returned to her care.
In fall 2015, DHS concluded that mother and AJB were not making sufficient progress to justify continuing a plan of reunifying the children with them and sought a change of permanency plan for both children from reunification to adoption. The juvenile court held a permanency hearing in early 2016 in accordance with the time requirements in ORS 419B.470(2). At that hearing, the court heard testimony from AJB, the DHS caseworker, and various service providers who had worked with mother, AJB, and the children. Mother did not testify.
AJB testified that he believed that DHS had become involved with the family because he had spanked L and because he and mother had decided to "keep [the spanking] to ourselves." When asked specifically if he had caused the bruises on L, AJB equivocated, first claiming that the bruises did not come from a spanking, then stating, "I'm not denying it [came] from a spanking. But I'm not crediting it to a spanking." AJB testified that he and mother were currently living in a recreational vehicle that they had to park on the street. At several points during his testimony and the testimony of other witnesses, he became angry. On two occasions, the court recessed because of his behavior and asked AJB's attorney to talk with AJB about his behavior in the **43 courtroom. On those occasions, AJB's yelling in the hallway could be heard inside the courtroom.
The family's DHS caseworker, Gould, testified that, although mother had developed parenting skills, mother had not developed the capacity to protect the children. Gould believed that mother's dishonesty showed that she was more protective of AJB than of her children, as evidenced by mother hiding the fact that she had married AJB. Gould testified that she had trouble communicating with AJB because he became very agitated and angry, and became "threatening verbally." Gould expressed safety concerns for the children due to AJB's inability to regulate his emotions. She stated that AJB had entered a Lane County Circuit Court veterans' court program following a felony charge, but that he was not in compliance with his conditions of probation because he regularly used cannabis to treat chronic pain, Post-Traumatic Stress Disorder (PTSD), and kidney problems. Gould also testified that AJB and mother had indicated that, if they regained custody of the children, they would cut off contact with the foster parents and would move to Washington, possibly to live with AJB's mother, who also had threatened Gould. Gould stated that, while both mother and AJB had made progress, she did not believe that the children could be reintegrated into their home in a reasonable time.
The hearing also included testimony from three therapists. Mother, along with L, had begun seeing a family therapist in November 2014. The family therapist testified that mother had made progress in learning to regulate herself and to provide support for L. Mother also had told the therapist that she wanted to bring AJB into the sessions with L. The family therapist therefore met with AJB on several occasions during which AJB was emotional, tearful, and angry. The therapist ultimately recommended against conducting family therapy sessions for L that included AJB because it would be "unsafe emotionally" for L, who would be at risk of experiencing trauma-associated fear and distress if contact with AJB were allowed.
Mother also had begun dialectical behavioral therapy in July 2015. That therapist testified that mother was **44 making progress. While mother had been angry and frustrated when she started therapy, she had now transformed that anger into sadness about her children. Mother's therapist indicated that mother acknowledged that the incident in which AJB hit L was not "good behavior." However, mother had remained defensive *1025 about her role in trying to cover up what had occurred and failed to disclose to the therapist for at least two months that she had married AJB. The therapist also reported that mother's relationship with AJB remained contentious and involved yelling, but that mother was working on that.
AJB also had begun receiving individual therapy in July 2015. His therapist testified that AJB had shown improvement in emotional management and improved his parenting techniques. The therapist also opined that AJB's PTSD could not be resolved unless A and L were placed in his care.
At the close of the hearing, the juvenile court stated that it did not find any of the testimony by the therapists to be helpful because the two individual therapists were biased and because the family therapist's testimony was unclear. The court further noted that this case had involved "dishonesty from the very first day" and that professional assessments were only as good as the information provided, which made them unreliable when dishonesty was present.
We describe the juvenile court's permanency judgments in some detail because the court's findings and determinations help explain the structure of the statutes at issue. In its separate judgments in the cases involving L and A, the juvenile court made specific findings required under ORS 419B.476 and related statutes based on the case plans and the two days of testimony and other evidence submitted by the parties. The court noted, among other things, that the children were in relative foster care; that DHS had facilitated continuing contact between mother and AJB and A, and between mother and L; and that the case plan for each child at the time of the hearing was reunification and the concurrent plan was adoption.
Because each case plan at the time of the hearing was reunification, the court considered the efforts that DHS
**45 had made to facilitate reunification and the progress that mother and AJB had made towards that end, as required by ORS 419B.476(2)(a). In doing so, the juvenile court was required to "consider the [children's] health and safety the paramount concerns." Id. The court determined that DHS had made "reasonable efforts *** to make it possible for the [children] to safely return home."Id. However, the court determined that mother and AJB had not made "sufficient progress to make it possible for the [children] to safely return home." Id. Those determinations are not disputed in this court.
Having determined that parents had not made sufficient progress, by the time of the hearing, for the children to return home, the juvenile court next considered whether the permanency plans should be changed away from reunification. In this case, the court concluded that the plans should be changed away from reunification based on its finding that "the evidence does not support a determination under ORS 419B.476(4)(c) and (5)(c) that further efforts will make it possible for the child to safely return home within a reasonable time." (Boldface text in original.)
In reaching that conclusion, the juvenile court relied on factual findings that were substantially equivalent in both cases, including that mother "continues to struggle with accountability and honesty," and that she lacked "an awareness of the risks posed by [AJB] and continue[d] to put her relationship with [AJB] before the best interest of her children." The court found that AJB was "not credible." The court also noted that mother had "lacked emotional regulation during the hearing" and that AJB had "lacked the ability to regulate his emotions and temper," as demonstrated by his disruptions. The court found that mother "has yet to realize how her conduct and behavior caused [the children] to come into" the court's jurisdiction, that both she and AJB were "unwilling to admit that [AJB's] conduct [towards L] amounted to abuse," and that both had yet to recognize how their conduct and behavior had caused the children to be brought within the jurisdiction of the juvenile court. The court stated that, although mother and AJB do well "under close supervision," "once out of direct supervision they return to conduct of their own choosing, regardless **46 of whether or not it is in [the childrens'] best interest." The court found that both mother and AJB had demonstrated an inability to implement skills learned during services, noting in particular their desire to have contact between *1026 AJB and L, despite the family therapist's opinion that such conduct would be emotionally unsafe. The court concluded that the "circumstances and conditions" that were the basis for jurisdiction "have not been ameliorated." The court further noted that the children had been represented by an attorney throughout the proceedings and that the attorney supported the placement with the maternal aunt and the change of plan to adoption.
Because of those determinations, and the court's further findings that DHS had made sufficient efforts to develop the concurrent plan of adoption, see ORS 419B.476 (4)(e) (allowing court to review DHS efforts to develop concurrent plan), that DHS had been in contact with grand-parents, and that the "current foster parents are willing to serve as a permanent resource," the court changed both children's' permanency plans from reunification to adoption. Having determined that the plans should be changed to adoption, the court turned to ORS 419B.476(5)(d), which provides that, in those circumstances, the permanency order is to include "the court's determination of whether one of the circumstances in ORS 419B.498(2) is applicable." As noted previously, that cross-reference is to a specific provision in the termination of parental rights statute, and allows a party to argue to the juvenile court that a termination petition should not be filed, despite the otherwise applicable statutory deadline, if a "compelling reason" is shown. The juvenile court found that "there is not a 'compelling reason' within the meaning of that term in ORS 419B.498(2)(b) for determining that filing a petition to terminate the parent's/ parents' rights would not be in the child's best interests ***." (Boldface text in original.)
Both mother and AJB appealed the permanency judgments. Mother did not dispute that DHS had made reasonable efforts to make it possible for the children safely to return home. Nor did mother or AJB challenge, in the context of the juvenile court's initial determinations to change the plan away from reunification, the court's determination **47 under ORS 419B.476(4)(c) and (5)(c) that the children would not be able safely to return home in a reasonable time. Their principal argument concerned the court's subsequent determination under ORS 419B.476(5)(d) that there was no compelling reason under ORS 419B.498(2)(b) to defer filing petitions for the termination of parental rights.[3]
COURT OF APPEALS DECISIONS
In S. J. M. I , which concerned A, the Court of Appeals drew two significant legal conclusions. First, the court considered whether ORS 419B.476(5)(d) requires a juvenile court to make a finding pursuant to ORS 419B.498(2) that no "compelling reason" exists for DHS to defer the filing of a petition to terminate parental rights, before a permanency plan can be changed to adoption. Because its earlier decisions on that question were not entirely consistent, the Court of Appeals considered the issue and ultimately concluded that such a determination was required. S. J. M. I , 283 Or. App. at 392, 388 P.3d 417. DHS did not seek review of that holding, and we express no opinion regarding it.
The second legal conclusion, which DHS challenges on review, is that the record did not support the juvenile court's determination that there was no "compelling reason" for determining that filing a petition for termination of parental rights would not be in the best interests of the child. S.J.M. I , 283 Or. App. at 393-94, 388 P.3d 417 ; ORS 419B.498(2)(b). More particularly, DHS challenges the Court of Appeals' implicit conclusion that DHS, as the party urging the court to change the permanency plan, bore the burden of proving that there was no "compelling reason" not to change the plan-and that the absence of evidence in the record concerning a "compelling reason" precluded the juvenile court from changing the permanency plan from reunification to adoption.
Regarding A's permanency plan, the Court of Appeals acknowledged that the juvenile *1027 court had made explicit findings that A could not be returned to mother **48 within a reasonable time and that none of the circumstances in ORS 419B.498(2) applied because there was not a " 'compelling reason,' within the meaning of that term in ORS 419B.498(2)(b) for determining that filing a petition to terminate the parent's/parents' parental rights would not be in the child's best interests." S.J.M. I , 283 Or. App. at 393, 388 P.3d 417 (quoting juvenile court's judgment). The Court of Appeals determined, however, that there was insufficient evidence to support those findings:
"For example, there is nothing to suggest that A's anticipated stay in substitute care would be unacceptably long given her age, the time that she had already spent in foster care, or her unique permanency needs. ***
"Relatedly, there is no evidence of how long mother would have to remain in services before she could become a safe parent for A, or how such a delay would impair A's best interests. For example, there is no evidence that mother is serving a prison sentence that prevents her from obtaining needed services or interferes with her ability to bond with A. Nor is there evidence that mother suffers from drug or alcohol addiction, or that she has mental health issues that are too severe to alleviate within the foreseeable future. Finally, given mother's participation and progress to date in the programs she was required to complete, there is no evidence that her continued participation in those programs would not enable her to become at least a minimally competent parent within a reasonable time given A's particular needs."
Id. at 393-94, 388 P.3d 417 (citations and footnote omitted). Accordingly, the Court of Appeals concluded that the juvenile court's determinations under ORS 419B.498(2)(b) were erroneous as to mother. Id . at 394, 388 P.3d 417.[4]
Relying in significant part on its decision in S.J.M. I , the Court of Appeals reached a similar conclusion in S.J.M. II , which concerned the change in L's permanency plan. The court stated:
"[W]e agree with mother that the court erred in determining that her participation and progress in services was **49 not a compelling reason to defer termination proceedings. Like the court's determination under ORS 419B.476(2)(a), the court's compelling-reasons determination under ORS 419B.498(2)(b) relied on essentially the same record as to each child. It is true that L is several years older than A and was removed from his mother's care as a toddler rather than as an infant. It is also true that, unlike A, L exhibited direct and ongoing consequences of his abuse, such as anxiety and lingering fear. Finally, unlike A, L had special behavioral, therapeutic, and medical needs.
"As in A's case, however, the record is devoid of evidence connecting L's circumstances or needs to a desirable permanency timeline or to any projected timeline for mother to become a safe resource for L. As with A, there is no evidence to support the conclusion that, given L's specific permanency concerns, it would be unreasonable to give mother additional time to participate in services before moving forward with termination proceedings and adoption efforts. Nor is there evidence showing that mother faced any specific barriers-such as incarceration, significant substance-abuse or mental-health issues, or anything else-that would unreasonably prolong L's stay in foster care in light of his particular permanency needs. Thus, despite any arguable differences between L's and A's circumstances, the record in L's case is equally insufficient to support the juvenile court's implicit determination that mother's successful participation in services would not enable L to return home within a reasonable time."
S.J.M. II , 283 Or. App. at 599-600, 388 P.3d 1199 (citations and footnote omitted). We allowed DHS's petitions for review in both cases.
*1028 DISCUSSION
The gravamen of DHS's argument is that the Court of Appeals, in holding that the juvenile court's findings under ORS 419B.476(5)(d) and ORS 419B.498(2)(b) were not supported by evidence in the record, erroneously concluded that DHS had failed to meet its burden of proof as to the absence of such a "compelling reason." In particular, DHS contends that the Court of Appeals' emphasis on what was not in the record that could have supported a conclusion that a "compelling reason" existed, rather than on what was in the record that supported the juvenile court's determination **50 that a "compelling reason" did not exist, essentially turned ORS 419B.498(2) on its head.
DHS argues that the Court of Appeals reversed the burden of proof under that subsection by implying that DHS had an evidentiary burden to establish that there was no conceivable "compelling reason" to conclude that filing a petition for termination of parental rights would not be in the child's best interest.[5] DHS maintains that the burden to establish that there is a "compelling reason" should instead be placed on the party opposing the change of plan from reunification to adoption. Mother[6] responds that DHS's position would create a presumption under ORS 419B.498(2) that a change of plan to adoption is in a child's best interest if the child cannot be returned to the parent at the time of the permanency hearing. She argues that such a reading would not comport with the legislative intent behind the statutes, which was to prioritize reunification of families whenever possible. As we explain below, we agree with DHS that the Court of Appeals misconstrued the relevant statutes and reached erroneous dispositions in these cases.
Before interpreting the statutes at issue, it is helpful to place the permanency decisions at issue here in context. When the juvenile court takes jurisdiction of a child, a series of complex statutes and proceedings come into play. Those statutes seek to protect the safety and well-being of children, and the rights of both children and parents. See ORS 419B.090(2) - (4) (describing constitutional and statutory rights of children and parents). Oregon's policy recognizes that, even when parents are unable to care for their children for a period of time, there is a "strong preference that **51 children live in their own homes with their own families," ORS 419B.090(5), and DHS is obligated, except in cases involving "extreme conduct," to work with families toward family reunification at the outset. Id .; ORS 419B.502. But Oregon's policy also recognizes that "it is not always possible or in the best interests of the child or the public for children who have been abused or neglected to be reunited with their parents." Id. Children have a right to "permanency with a safe family," ORS 419B.090(2)(a)(A), and the state has an "obligation to create or provide an alternative, safe and permanent home for the child." ORS 419B.090(5). That right to permanency sometimes can conflict with a parent's interest in having additional time to make sufficient progress for the child to be safely returned home.
The policy interests described above have led Congress and the Oregon Legislative Assembly to establish timelines for DHS and the juvenile court to act in cases involving children within the jurisdiction of the court. Although this case involves the appeals of a permanency judgments, the critical timeline at issue here is found in the statute establishing the procedures for filing a petition to terminate parental rights, because of the cross-reference in ORS 419B.476(5)(d) (permanency) to ORS 419B.498 (termination). ORS 419B.498 attempts to accommodate the *1029 rights of parents and children. It seeks to move children in foster care toward a permanent home by setting a deadline for DHS to file a petition to terminate parental rights and proceed with adoption. But it also has an exception that allows DHS not to file by that deadline if certain determinations are made. Specifically, ORS 419B.498(1)(a)requires DHS to file a petition to terminate parental rights and proceed with adoption when a "child or ward has been in substitute care under the responsibility of the department for 15 months of the most recent 22 months,"unless some exception applies. ORS 419B.498(2) then sets forth the exceptions to that requirement:
"(2) The department shall file a petition to terminate the parental rights of a parent in the circumstances described in subsection (1) of this section unless :
"(a) The child or ward is being cared for by a relative and that placement is intended to be permanent;
**52 "(b) There is a compelling reason, which is documented in the case plan, for determining that filing such a petition would not be in the best interests of the child or ward. Such compelling reasons include, but are not limited to:
"(A) The parent is successfully participating in services that will make it possible for the child or ward to safely return home within a reasonable time as provided in ORS 419B.476(5)(c).
"(B) Another permanent plan is better suited to meet the health and safety needs of the child or ward, including the need to preserve the child's or ward's sibling attachments and relationships; or
"(C) The court or local citizen review board in a prior hearing or review determined that while the case plan was to reunify the family the department did not make reasonable efforts or, if the Indian Child Welfare Act applies, active efforts to make it possible for the child or ward to safely return home; or
"(c) The department has not provided to the family of the child or ward, consistent with the time period in the case plan, such services as the department deems necessary for the child or ward to safely return home, if reasonable efforts to make it possible for the child or ward to safely return home are required to be made with respect to the child or ward.
"(3) No petition to terminate the parental rights of a child or ward's parents pursuant to subsection (1) of this section *** may be filed until the court has determined that the permanency plan for the child or ward should be adoption after a permanency hearing pursuant to ORS 419B.476."
(Emphasis added.)
ORS 419B.498(2) thus permits DHS not to proceed with a petition to terminate parental rights, but only under limited circumstances. The text of the statute is unambiguous: DHS "shall file a petition *** unless " (as relevant here) "there is a compelling reason, which is documented in the case plan, for determining that filing such a petition would not be in the best interests of the child or ward." (Emphasis added.) Unless the exception applies, DHS must proceed to file a petition to terminate parental rights and move toward **53 adoption. When DHS invokes that exception because of the existence of a "compelling reason," the statutory text plainly places the burden of "document[ing] in the case plan" that the "compelling reason" exists on DHS.
In the permanency hearing context, the juvenile court, rather than DHS, must make the determination under ORS 419B.476(5)(d). Although the decisionmaker is different, the inquiry is the same. As in ORS 419B.498(2) itself, the party that wishes to show that the exceptions in ORS 419B.498(2)do apply bears the burden of proof. That party could be, as in this case, a parent who disagrees with DHS's assessment of whether he or she will be able safely to parent the child within a reasonable time. In other cases, it might be a child or DHS itself that does not want a petition to terminate parental rights promptly to be filed. Under ORS 419B.476(5)(d), the person or entity seeking to come within the exception bears the burden of proving that it applies.
That interpretation is reinforced by the close connections between the Oregon statute and the Adoption and Safe Families Act of *1030 1997 (ASFA). 42 USC §§ 671, 675. ORS 419B.498(1) and (2) were enacted to implement ASFA. See Or. Laws 1999, ch. 859, §§ 21 (SB 408) ("Relating to the implementation of the Adoption and Safe Families Act of 1997"). ASFA established various requirements that state child welfare systems must meet to receive federal funds, and Oregon, like other states, amended its statutes to comply with the federal mandates. Indeed, the structure and wording of the Oregon statute, discussed above, are almost identical to the structure and wording of ASFA, with a specific deadline for moving to permanency and an "escape clause" if there is a "compelling reason" not to proceed towards termination of parental rights and adoption. AFSA provides:
"(E) in the case of a child who has been in foster care under the responsibility of the State for 15 of the most recent 22 months *** the State shall file a petition to terminate the parental rights of the child's parents *** and, concurrently, to identify, recruit, process, and approve a qualified family for an adoption, unless
* * * * *
**54 (ii) a State agency has documented in the case plan (which shall be available for court review) a compelling reason for determining that filing such a petition would not be in the best interests of the child * * *."
42 USC § 675(5)(E) (emphasis added).
The federal regulations implementing ASFA reflect the same policy and, again, in structure and wording are virtually identical to the Oregon statute. Those regulations provide that the state agency
"must file a petition *** to terminate the parental rights of a parent(s):
"(i) whose child has been in foster care under the responsibility of [the state agency] for 15 of the most recent 22 months."
45 CFR § 1356.21(i). But the agency
"may elect not to file *** if: *** the [state agency] has documented in the case plan (which must be available for court review) a compelling reason for determining that filing such a petition would not be in the best interests of the individual child."
45 CFR § 1356.21(i)(2).
Like the parallel federal statutes, ORS 419B.498 requires DHS to proceed with a petition to terminate parental rights unless there is evidence, documented in the case plan, that establishes a "compelling reason" not do so. Nothing in the structure, text, or context suggests that DHS always has the burden to prove that there is not a "compelling reason" for determining that filing a termination petition would not be in the best interests of the child.
That conclusion is buttressed by comparing ORS 419B.498(2) with other provisions in the juvenile code. Many of those provisions require the state to perform some action or to meet some burden of proof before a parent's rights can be limited or terminated. Among those statutes are ORS 419B.521(1), requiring DHS to prove by clear and convincing evidence "[t]he facts on the basis of which the rights of the parents are terminated;" ORS 419B.310(3), requiring **55 that jurisdictional facts "must be established by a preponderance of competent evidence;" and ORS 419B.476(2)(a), requiring a finding that DHS has made "reasonable efforts" to reunite the family before the permanency plan can be changed to adoption. Here, of course, ORS 419B.498(2)does require a particular action by DHS-the filing of a petition to terminate parental rights-unless there is a "compelling reason" that doing so would not be in the child's best interest. But the logic and structure of that statute place the burden of demonstrating such a "compelling reason" on the party seeking to avoid the action that will be taken if such a reason cannot be shown. In this case, it is parents, not DHS, who seek to establish a "compelling reason," and it was their burden to prove facts that would allow the court to make that determination.
Finally, DHS's position draws support from our ordinary evidentiary rules regarding burdens of persuasion when facts are in dispute. OEC 305 provides that a party has the burden of persuasion "as to each fact the existence or nonexistence of which the law declares essential to the claim for relief or *1031 defense the party is asserting." Here, DHS asserted, and the juvenile court found, that parents had not made sufficient progress for children to be safely returned to them at the time of the permanency hearing. ORS 419B.476(2)(a). DHS further asserted, and the juvenile court also found, that the evidence did not support a determination that further efforts would make it possible for the children to return home within a reasonable time. The court made an initial determination that the permanency plans should be changed to adoption. On review, parents argue only that, despite those determinations, there are "compelling reasons" that filing termination petitions would not be in the children's best interests and, therefore, that the juvenile court's determination under ORS 419B.476(5)(d) and ORS 419B.498(2)(b) was incorrect. Their position is essentially a "defense" to the consequences that would otherwise flow from those determinations. Accordingly, OEC 305 supports our determination that mother and AJB, and not DHS, bore the burden of proving a "compelling reason" that filing termination petitions would not be in the best interests of the children. **56 Contrary to the Court of Appeals' suggestion, therefore, DHS was not required also to prove that there were not any "compelling reasons." Nor, if the evidence before the juvenile court failed to rule out a particular "compelling reason," was the juvenile court required to presume that there was a "compelling reason." The Court of Appeals therefore erred in holding that the lack of evidence that there was not a "compelling reason" called the juvenile court's decision into question.
The Court of Appeals also held that the juvenile court had "erred in determining that [mother's] participation and progress in services was not a compelling reason to defer termination proceedings." S.J.M. II, 283 Or. App. at 599-600, 388 P.3d 1199. But, because the court erred in focusing on what it concluded DHS had been required to prove-the absence of a "compelling reason" not to file a petition-rather than, as we hold, whether mother had proved the existence of a "compelling reason," it reached a result that cannot be supported under the correct interpretation of the statutes.
To be sure, the Court of Appeals opinions identified circumstances where no compelling reason to delay termination would exist-such as where a parent is serving a lengthy term of incarceration or has serious, ongoing substance-abuse or mental-health issues. But nothing in the statutory text or structure suggests that only such intractable conditions can be the basis for a finding of no "compelling reason" under ORS 419B.498(2)(b). Here, although it did not review the record de novo, the Court of Appeals nevertheless revisited and rejected the juvenile court's determination, based on the case plans and extensive testimony, including credibility findings, that mother's "participation and progress in services was not a compelling reason to defer termination proceedings." That was error.
Evaluated under the appropriate standard of review, and without placing a burden of proof on DHS, the juvenile court's determination must be upheld. Whether a "compelling reason" exists is a legal question, but one dependent on factual findings. Thus, the question before us on review is more properly understood as whether there was evidence in the record to support the juvenile court's findings of fact **57 upon which its conclusion in each case that there was not a "compelling reason" was based.
In these cases, the juvenile court found that DHS had made reasonable efforts to reunite L and A with their parents. Those findings were not challenged. The juvenile court also made findings, unchallenged here, that mother and AJB had not made sufficient progress to allow them to be reunited with their children. The case plans, testimony, and other evidence presented at the hearing allowed the trial court to find that mother had problems with dishonesty (including about her relationship with AJB); that she continued to refer to the abuse of L as a "spanking;" that she lacked awareness of the risks that AJB posed to the children; and that, while she was able to adequately parent while under close supervision by DHS, she was not able to implement those skills except under direct supervision. Moreover, the juvenile *1032 court found that, despite reasonable reunification efforts by DHS and completion of parenting programs, both mother and AJB "have demonstrated an inability to implement skills learned during services engaged in during the life of this case." The court also found that mother put her relationship with AJB above the needs of her children and that she continued to promote contact between L and AJB despite receiving significant input from therapists and others that such contact would be harmful to L. The court made specific findings that the children could not "be safely returned to Mother's care in a reasonable time."
Further, the juvenile court's relevant factual findings are well supported by evidence in the record, as described above, particularly when considered in light of the evidence at the hearing that mother and AJB continued to live together, that AJB continued to deny having caused L's injury, and that AJB repeatedly demonstrated an inability to control his temper not only with the therapist and the caseworker who testified, but in-and immediately outside-the courtroom itself.
Those explicit and implicit factual findings, and the evidence in the record on which they were based, supported the juvenile court's legal conclusions, including its determination that there was no "compelling reason" that **58 the filing of petitions to terminate parental rights would not be in the bests interests of the children.[7] ORS 419B.498(2) (b). That determination satisfied the requirements of ORS 419B.476(5)(d) and ORS 419B.498(2).
The decisions of the Court of Appeals are reversed. The judgments of the circuit court are affirmed.
Walters, C. J., concurred and filed an opinion.
I write to emphasize the narrowness of our decision in this case and the significance of an issue that is not on review here. As the majority indicates, Dept. of Human Services v. S.J.M. , 364 Or. 37, 430 P.3d 1021 (2018), a juvenile court will not consider the question under ORS 419B.498 (2)(b) -that is, whether there is a compelling reason that filing a petition to terminate parental rights would not be in the best interests of the child-until the court already has determined that "the permanency plan for the ward should be adoption." ORS 419B.476(5)(d) ; see also ORS 419B.498(3) ("No petition to terminate the parental rights of a child or ward's parents *** may be filed until the court has determined that the permanency plan for the child or ward should be adoption after a permanency hearing pursuant to ORS 419B.476."). In my view, such a determination-that adoption and not reunification is the appropriate permanency plan-is a determination of significant consequence that must be assessed against a clear statutory standard. I write to articulate what I believe that standard to be and how I believe that assessment should occur.
In this case, the juvenile court determined, under ORS 419B.476(2), that, at the time of the hearing, (1) DHS had made reasonable efforts to make it possible for the children to return home; and (2) mother and AJB had not **59 made sufficient progress for the children to return home. The next question for the juvenile court was (3) whether "further efforts will make it possible for the ward to safely return home within a reasonable time." ORS 419B.476 (4)(c). Here, the court found that "the evidence does not support a determination under ORS 419B.476(4)(c) and (5)(c) that further efforts will make it possible for the [children] to safely return home within a reasonable time." (Boldface in original text). Mother and AJB do not challenge that determination. Instead, they challenge *1033 only the court's further determination under ORS 419B.498(2)(b) that there was no compelling reason not to file petitions terminating their parental rights, and that adoption was therefore the appropriate permanency plan. In that circumstance, I agree with the majority that the burden is on the party opposing adoption-in this case, mother and AJB-to demonstrate the existence of such a compelling reason. S.J.M. , 364 Or. at 52-53, 430 P.3d at 1029-30. But, in other cases, parents may challenge a juvenile court's determination under ORS 419B.476 (4)(c) and (5)(c) that further efforts will not make reunification possible. In my view, that determination is of great significance, and the applicable legal standard is quite explicit.
As the majority recognizes, the Oregon Legislative Assembly has adopted a "strong preference that children live in their own homes with their own families" and, with certain statutory exceptions, requires the state to offer parents reunification services "to make it possible for the child to safely return home within a reasonable time." ORS 419B.090(5). When such a return is not possible or in the child's best interests, the legislature has imposed an obligation on the state to "provide an alternative, safe and permanent home for the child." Id. In accordance with that policy, Oregon law provides that, when the case plan at the time of a permanency hearing is to reunify the family, the juvenile court must consider whether (1) DHS has made reasonable or, when applicable, active efforts to make it possible for the child to return home; and (2) the parents have made sufficient progress to make it possible for the child to safely return home. ORS 419B.476(2)(a). If a court answers both of those questions affirmatively or finds that DHS did not make the requisite efforts to make it possible for the child **60 to return home, then the court must continue the plan of reunification. See State ex rel. Juv. Dept. v. C.D.J. , 229 Or. App. 160, 164-65, 211 P.3d 289 (2009) ("[T]o obtain a change in the permanency plan from return to parent to adoption, DHS must prove that, despite its reasonable efforts to effect reunification, the parents did not make sufficient progress to allow the child's safe return to the home."); Dept. of Human Services v. S.M.H. , 283 Or. App. 295, 311-12, 388 P.3d 1204 (2017) (reversing permanency judgment that changed plan from reunification because evidence did not support finding that DHS's efforts were reasonable).
If, however, the court finds that, despite DHS's efforts, the parents have not yet made sufficient progress, then the court must consider a third question-whether "further efforts will make it possible for the ward to safely return home within a reasonable time." ORS 419B.476(4)(c). ORS 419B.476(4) provides as follows:
"(4) At a permanency hearing the court may:
"(a) If the case plan changed during the period since the last review by a local citizen review board or court hearing and a plan to reunify the family was in effect for any part of that period, determine whether the department has made reasonable efforts or, if the Indian Child Welfare Act applies, active efforts to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns;
"(b) If the case plan changed during the period since the last review by a local citizen review board or court hearing and a plan other than to reunify the family was in effect for any part of that period, determine whether the department has made reasonable efforts to place the ward in a timely manner in accordance with the plan, including, if appropriate, placement of the ward through an interstate placement, and to complete the steps necessary to finalize the permanent placement;
"(c) If the court determines that further efforts will make it possible for the ward to safely return home within a reasonable time, order that the parents participate in specific services for a specific period of time and make specific progress within that period of time;
**61 "(d) Determine the adequacy and compliance with the case plan and the case progress report;
"(e) Review the efforts made by the department to develop the concurrent permanent *1034 plan, including but not limited to identification of appropriate permanent in-state placement options and appropriate permanent interstate placement options and, if adoption is the concurrent case plan, identification and selection of a suitable adoptive placement for the ward;
"(f) Order the department to develop or expand the case plan or concurrent permanent plan and provide a case progress report to the court and other parties within 10 days after the permanency hearing;
"(g) Order the department or agency to modify the care, placement and supervision of the ward;
"(h) Order the local citizen review board to review the status of the ward prior to the next court hearing; or
"(i) Set another court hearing at a later date."
Thus, ORS 419B.476(4) lists, in paragraphs (a) through (i), various determinations that a court may make and orders that a court may enter. Because the permissive term "may" is used in the section's introductory phrase, a court is not required , at the outset, to make any particular determination or to enter any particular order; rather, a court only must consider whether to do so. Thus, in this case, the juvenile court considered, under paragraph (c), the question whether "further efforts will make it possible for the ward to safely return home within a reasonable time." Paragraph (c) does not require a particular answer to that question, but it expressly states what a court must do when it answers that question in the affirmative: A court must "order that the parents participate in specific services for a specific period of time and make specific progress within that period of time." A court does not have discretion to do otherwise.
ORS 419B.476(5)(c) then gives a court that enters such an order further instruction:
"(5) The court shall enter an order within 20 days after the permanency hearing. In addition to any determinations **62 or orders the court may make under subsection (4) of this section, the order shall include the following:
"* * * * *
"(c) If the court determines that the permanency plan for the ward should be to return home because further efforts will make it possible for the ward to safely return home within a reasonable time, the court's determination of the services in which the parents are required to participate, the progress the parents are required to make and the period of time within which the specified progress must be made."
Thus, under subsection (5)(c), a court that has determined under subsection (4)(c) that further efforts will make it possible for a child to safely return home within a reasonable time must adopt a permanency plan to "return home" and must include in that plan a determination of the services in which the parents are required to participate, the progress that the parents are required to make, and the period of time within which the specified progress must be made. It is only when a court determines that further efforts will not make it possible for the ward to safely return home within a reasonable time that the court may determine that the permanency plan should be a plan other than reunification.
I realize that the Court of Appeals may have articulated a different view. See Dept. of Human Services v. D. L. H. , 251 Or. App. 787, 805-806, 284 P.3d 1233, adh'd to as modified on recons , 253 Or. App. 600, 292 P.3d 565 (2012), rev. den. , 353 Or. 445, 300 P.3d 168 (2013). In D. L. H. , as in this case, the juvenile court found that DHS had made the requisite efforts to reunify the parents and their children and that, at the time of the hearing, the parents had failed to make sufficient progress to safely reunify the family. Id. at 794, 284 P.3d 1233. The juvenile court also found, with regards to the mother, that further efforts were unlikely to allow reunification within a reasonable period and determined that the permanency plan should be adoption. Id. On mother's appeal, the Court of Appeals concluded that the juvenile court's findings were supported by the record and affirmed. Id. at 803-06, 284 P.3d 1233. Had the Court of Appeals rested its affirmance on that conclusion alone, **63 I would not question *1035 it. I agree that, when a juvenile court determines, as a matter of fact, that further efforts will not make it possible to safely reunify a family within a reasonable time and that determination is supported by the record, the juvenile court does not err in adopting a permanency plan other than reunification. However, on its way to that correct conclusion, the Court of Appeals included two other statements unnecessary to its decision in D.L.H. with which I disagree.[1]
First, the court stated that "there is no statutory requirement under ORS 419B.476 or any other authority that requires the juvenile court to find that a parent cannot be reunited with the child within a reasonable time before the court changes the plan from reunification to adoption." Id. at 805, 284 P.3d 1233. Second, the court stated that "it is within the juvenile court's discretion whether to order a parent to participate in services, if the court concludes that the parent can be reunified with the child within a reasonable time and with the aid of additional services." Id. at 805-06, 284 P.3d 1233. For those statements, the court relied on the permissive verb "may" used in the introductory phrase of ORS 419B.476(4). Id. at 805, 284 P.3d 1233. The court reasoned that, in the circumstance in which a juvenile court finds that it is possible for a child to be safely returned within a reasonable time, the court "may" nevertheless decide not to order further services and not to continue the plan of reunification. Id. That reasoning is wrong.
As I have explained, although the introductory phrase in subsection (4) uses a permissive term, paragraph (c) does not. When a juvenile court finds, under paragraph (c), that further efforts will make safe reunification possible within a reasonable time, it has no choice but to order parents to participate in and make progress in those efforts and continue the plan of reunification. That mandate reflects the legislature's strong preference that children live "in their own homes with their own families." ORS 419B.090(5). Nowhere in ORS 419B.476 is there any indication that, when a court finds that further efforts will make reunification possible, it **64 has discretion to refuse to enter the order required by subsection (4)(c) or to adopt a permanency plan other than to return home as set out in subsection (5)(c).
It is only when a court finds that further efforts will not make reunification possible that a juvenile court may adopt a permanency plan other than reunification. That is what happened here. After deciding, under ORS 419B.476 4)(c), that further efforts would not make reunification possible, the court decided that adoption was the appropriate permanency plan. At that point, the considerations set out in ORS 419B.476(5)(d) were triggered. Once the court determined that adoption was the appropriate permanency plan, the court was required to consider, under ORS 419B.476 (5)(d), the further question of "whether one of the circumstances in ORS 419B.498 (2) is applicable."
Under ORS 419B.498(1), DHS must, in specified circumstances, simultaneously file a petition to terminate parental rights and take steps to identify and approve a family for adoption. One of the conditions that requires the filing of a petition to terminate parental rights is that the child "has been in substitute care under the responsibility of the department for 15 months of the most recent 22 months." ORS 419B.498(1)(a). However, even in that circumstance, DHS may refrain from filing a termination petition if there is a compelling reason that "filing such a petition would not be in the best interests of the child" under ORS 419B.498 (2)(b). In this case, we decide that a party who argues that such a compelling reason exists has the burden to persuade the court of that fact, S.J.M. , 364 Or. at 52-53, 430 P.3d at 1029-30, and I agree with that conclusion.
But what I think far more important, and the reason that I write, is to emphasize that a juvenile court will not reach the question of whether the filing of a termination petition is excused unless it first has determined that reunification is not the appropriate plan and that the permanency plan for the child should be adoption. That significant determination depends, as I have explained, on three preliminary factual questions: (1) whether, at *1036 the time of the permanency hearing, DHS has made reasonable or, when appropriate, active efforts to reunify the family; (2) whether, **65 at the time of the permanency hearing, the parents have made sufficient progress for the child to safely return home; and, if not, (3) whether further efforts will make it possible for the child to safely return home within a reasonable time. ORS 419B.476(2)(a), (4)(c). A party seeking to change the permanency plan away from reunification will have the burden to persuade the juvenile court of the facts that demonstrate that reunification, although preferred, is not appropriate under the legal standards that the legislature has imposed.
Children have a right to permanency with a safe family. ORS 419B.090(2)(a)(A). When their own family is a safe family, or within a reasonable time may become a safe family, then children have a right to permanency with their own family. The law protects, and must be interpreted to protect, that right.

No party requested de novo appellate review pursuant to ORS 19.415(3)(b), either in the Court of Appeals or in this court. Accordingly, our review, like that of the Court of Appeals, is for errors of law. ORS 19.415(1).

L's father was a party in the trial court proceedings and participated by telephone because his conditions of parole did not permit him to leave California. However, he is not a party on review, and, for that reason, we do not discuss the allegations regarding him.

Both mother and AJB also challenged the juvenile court's finding that they had not made sufficient progress toward the goals set forth in the case plans. The Court of Appeals rejected that argument, and it was not raised again in this court.

The court had earlier concluded that sufficient evidence supported the juvenile court's conclusions as to AJB. S.J.M. I , 283 Or. App. at 379-81, 388 P.3d 417. Those findings are not challenged on review.

The Court of Appeals did not use the terms "burden" or "burden of proof" in either S.J.M. I or S.J.M. II to describe its holdings. However, the court's emphasis on what it perceived as the absence of evidence to support DHS's contention (and the juvenile court's findings) that there was no "compelling reason" makes it clear that it believed that the burden was on DHS. Moreover, later Court of Appeals cases have read S.J.M. I as placing that burden on the party seeking a change in the permanency plan, here, DHS. See Dept. of Human Services v. M. S. , 284 Or. App. 604, 609, 393 P.3d 270 (2017) (citing S.J.M. I, 283 Or. App. at 392, 388 P.3d 417 ).

Although AJB is a respondent on review in S.J.M. II , he has not advanced legal arguments separate from those made by mother and has not challenged the Court of Appeals' conclusions as to him. Accordingly, our references are to mother as respondent on review in both cases.

Mother also argues that the juvenile court erred in implicitly determining that her parent-child bond with A was not a "compelling reason" under ORS 419B.498(2)(b)(B) ("Another permanent plan is better suited to meet the health and safety needs of the child or ward, including the need to preserve the child's or ward's sibling attachments and relationships[.]") (Emphasis added.) We need not determine in this case whether parent-child bonds fall under ORS 419B.498 (2)(b)(B) -or otherwise may constitute a "compelling reason." Even on the assumption that they may, the juvenile court's determination was supported by ample evidence that a plan to reunite A with mother was not best suited to meet A's "health and safety needs."

See Dept. of Human Services v. S. J. M. , 283 Or. App. 367, 386-87, 388 P.3d 417 (2017) (explaining that statements in D. L. H. were unnecessary to its conclusion).