No. 105          February 12, 2025          829

***This is a nonprecedential memorandum opinion
pursuant to ORAP 10.30 and may not be cited
except as provided in ORAP 10.30(1).***

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of M. T.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

K. T.,
*Appellant.*

Multnomah County Circuit Court
20JU03201;
Petition Number 114070;
A184584 (Control), A184587

In the Matter of R. T.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

K. T.,
*Appellant.*

Multnomah County Circuit Court
20JU03202;
Petition Number
114070;
A184585, A184588

In the Matter of K. T.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

K. T.,
*Appellant.*

Multnomah County Circuit Court
20JU03203
Petition Number 114070;
A184586, A184589

Linda Hughes, Judge.

Submitted December 5, 2024.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Tiffany Keast, Deputy Public Defender, Oregon Public Defense Commission, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Erin K. Galli, Assistant Attorney General, filed the brief for respondent.

Before Shorr, Presiding Judge, Powers, Judge, and Pagán, Judge.

PAGÁN, J.

Affirmed.

## PAGÁN, J.

In this consolidated juvenile dependency case, father appeals from judgments establishing durable guardianships for his three children, M, R, and K, each of whom are Indian children within the meaning of the Oregon Indian Child Welfare Act (ORICWA) and the federal Indian Child Welfare Act (ICWA).[1] *See* ORS 419B.600 - 419B.665; Indian Child Welfare Act of 1978, 25 USC §§ 1901 - 1963. Father assigns 15 errors, addressing three issues. In his first through third assignments, father challenges the juvenile court's finding that the Department of Human Services (DHS) made active efforts to reunite the family. In his fourth through ninth assignments, father argues that the trial court erred when it failed to act *sua sponte* to exclude an expert witness's testimony that father asserts commented on ultimate legal conclusions. In his tenth through twelfth assignments, father argues that the trial court erred in then relying on that testimony in coming to the same legal conclusion. In his thirteenth through fifteenth assignments, father contends that, based on the other alleged errors, the court erred in entering the guardianship judgements. We conclude that the trial court did not err in finding active efforts. Father's arguments on assignments of error four through twelve are unpreserved and are not plain error. We thus affirm.

We review the juvenile court's legal conclusions for errors of law and are bound by its findings of historical fact if there is any evidence in the record to support them. *Dept. of Human Services v. J. G.*, 260 Or App 500, 504, 317 P3d 936 (2014). "[W]e view the evidence in the light most favorable to the court's disposition to determine if it supports the court's legal conclusions." *Dept. of Human Services v. S. J. M.*, 364 Or 37, 40, 430 P3d 1021 (2018). We recite the facts with the standard of review in mind.

Father and children are enrolled members of the Native Village of Deering, Alaska, a federally recognized tribe. The children's mother died in 2018 in a car accident. DHS first became involved in 2019 after receiving reports

---

[1] Father also appeals from a related permanency judgment regarding each child but does not raise any error related to those judgments.

that father had yelled at the children and threatened to kill them, which resulted in voluntary engagement with DHS. DHS removed the children in May 2020 based on reports of violence against the children and placed them with their paternal grandmother. The juvenile court took jurisdiction over the children in June 2020 based on the allegation that father "has an anger control problem that interferes with his ability to safely parent the children." Also in June 2020, DHS arranged for a psychological examination, and helped father subsequently enter twice weekly therapy. DHS helped father enter a domestic violence (DV) parenting program in September 2020, which he completed successfully in October 2021. Father also completed anger management classes. In February 2021, father admitted to additional jurisdictional bases, including that his mental health issues impaired his ability to safely parent the children and to consistently meet their needs, that his conditions had contributed to him engaging in violent and frightening conduct toward the children (causing physical and emotional harm), and that father needed "the assistance of DHS and the Court to understand and meet" the children's special needs. DHS provided father another psychological exam in January 2022; the resulting report noted some delusional thinking but otherwise acknowledged "strong progress." By the summer of 2022, DHS reunited M and K with father.[2] DHS provided daily in-home support to father to help with morning and evening domestic routines. But DHS removed M and K in October of 2022 after father threw a sharp knife past M's head into the sink to scare M.

DHS provided father another psychological exam in November, during which father acknowledged that his behavior towards M and K had been inappropriate. The psychologist noted that dialectical behavior therapy (DBT) treatment was an "ideal treatment modality" for father. DHS connected father with Portland DBT, and father received DBT in a group program from January 2023 through February 2024. Father never received individual DBT because the program that provided it was full.

[2] R did not want to be reunited with father and thus remained with grandmother.

In March 2023, the juvenile court changed the permanency plan from reunification to guardianship. Around that time, records indicate that father's therapy was reduced to once a month for unclear reasons, although in some months father still had two sessions. Sometime in fall 2023, during scheduled parenting time, father showed the children a video of graphic war footage and took them to a location they felt unsafe in to pass out flyers.

In February 2024, father withdrew from services, including from visiting his children, and therapy. Father's expressed reason for withdrawing was the perceived political leanings of the service providers and geo-political events occurring at the time. Father stated that he believed that the service providers were either politically adverse to him or supported causes or nations that were adverse to him and his beliefs. Father did not engage further with services or parenting time. A DHS caseworker texted father attempting to get him to re-engage, but father did not respond.

Before father stopped engaging in services, DHS had provided financial aid, logistical support, regular meetings, and a mentor, as well as the previously mentioned mental health interventions and parent trainings.

In March 2024, DHS filed a motion under ORS 419B.366 to establish a durable guardianship for each child with their paternal grandmother as guardian. The juvenile court held a contested hearing over two days in April and May 2024. Father's tribe supported the guardianship, and the children's lawyer agreed that a guardianship was the best permanency plan. The children's therapist testified that father's decision to stop seeing the children had been severely detrimental to them, and that the children blamed themselves.

At the hearing, DHS called Pearl Moto, the ICWA coordinator for the Native Village of Deering, to testify, and the court accepted her as an expert witness. The following exchange occurred during her testimony:

"**Q**   And do you believe that the—that the father was offered and provided with active efforts to prevent the need for removal?

"A   Yes.

"\* \* \* \* \*

"Q   And then as of today, do you believe the children would be at risk of serious physical or emotional harm if they were returned to the father?

"A   Yes."

The court concluded that DHS had made active efforts to reunite the family and that father presented a risk of emotional or physical harm to the children, and accordingly entered a judgment of guardianship for each child.

We begin with assignments of error one through three, regarding whether the trial court erred in concluding that DHS made active efforts to reunite the family as required by ORS 419B.366. A court may grant the guardianship of an Indian child only if it, among other requirements:

"(ii)   Finds that active efforts under ORS 419B.645 to reunite the Indian family did not eliminate the necessity for guardianship based on serious emotional or physical damage to the Indian child[.]"

ORS 419B.366(4)(a)(C)(ii).

Active efforts are those that are "affirmative, active, thorough, timely and intended to maintain or reunite an Indian child with the Indian child's family." ORS 419B.645(1). "Active efforts require a higher standard of conduct than reasonable efforts." ORS 419B.645(3). "That 'standard is understood to impose on the agency an obligation greater than simply creating a reunification plan and requiring the client to execute it independently.'" *Dept. of Human Services v. L. B.*, 325 Or App 176, 178-79, 528 P3d 808 (2023) (quoting *State ex rel Juv. Dept. v. T. N.*, 226 Or App 121, 124, 203 P3d 262, *rev den*, 346 Or 257 (2009)).

We conclude that the juvenile court did not err when it determined that DHS had made active efforts. DHS provided significant assistance to father to not only address his mental health needs, but to generally support the family. Father received psychological examinations, therapy, parenting classes, and a wide range of other mental health and community support. DHS returned his children to him

and provided mentorship, further community support, and in-home support during that period. Father argues that DHS could have provided rent assistance timelier during this period, but housing was not an adjudicated basis for jurisdiction.

Father notes that his psychologist suggested that DBT was an ideal treatment modality and argues that the lack of individualized DBT treatment, rather than group treatment, constitutes a lack of active efforts. But under the circumstances and given the range of services father was already provided, including DBT group treatment, DHS was not required to wait to provide father with individualized DBT once it became available. *See L. B.*, 325 Or App at 182 ("The fact that [the] mother might benefit from specific therapies according to her counselor does not mean that DHS was required to provide those services, particularly given [the] mother's lack of progress despite the extensive efforts DHS had already made."). Father also points to a family meeting in which the issue of increasing father's therapy to weekly appointments was discussed. But having a meeting and discussing a potential change in the treatment plans does not create a specific burden on DHS to execute whatever plan might have been discussed.

Father argues the reduction in therapy sessions in spring 2023 constitutes a lack of active efforts. The parties disagree over what caused the therapy sessions to decrease in frequency. Father argues that his insurance was the problem, which, according to him, means that it was DHS's responsibility to provide therapy that his insurance would not cover. DHS argues that the record is unclear and suggests that a therapist's note indicates the sessions were reduced in light of his DBT sessions, which had begun in January 2023. DHS identified evidence to support this inference and, given our standard of review, we are bound by it. We thus do not conclude that the decrease in therapy constituted a lack of active efforts.

Father argues that his disengagement from services due to professed political reasons is the direct result of DHS's failure to ensure that he was receiving sufficient mental health services. But because there was not clear evidence

on this point, we cannot conclude that father's withdrawal was tied to his mental health, or because of a principled personal belief, or both. In any event, the record supports the finding that DHS had provided father extensive services and was attentive to father's mental health and other parenting needs. Most crucially, the measure of active efforts is not success; failure might happen even when DHS makes active efforts. *See Dept. of Human Services v. M. G. J.*, 326 Or App 426, 438, 532 P3d 905, *rev den*, 371 Or 476 (2023) (when a parent chooses to disengage, and fails to re-engage despite DHS efforts, DHS has not failed to make active efforts). Given the vast array of services that DHS provided over a four-year period, the trial court did not err in concluding that DHS provided active efforts to reunify the family.

We now turn to assignments of error four through nine, which take issue with the previously quoted testimony by tribal representative Moto, and assignments of error ten through twelve, challenging the court's reliance on that testimony. Father asserts that the trial court erred in allowing an expert witness to testify to legal conclusions, i.e., that DHS had engaged in active efforts and that father's continued custody was likely to result in serious emotional or physical damage to the children.

Father did not preserve these arguments and seeks plain error review. DHS argues that the error is not obvious because the law at the time did not clearly and categorically exclude such evidence. Thus, the state argues, it is not plain error. We agree. *State v. Vanornum*, 354 Or 614, 629, 317 P3d 889 (2013) (plain error must be obvious); *see Madrid v. Robinson*, 324 Or 561, 567, 931 P2d 791 (1997) (experts may testify to the ultimate issue so long as it pertains to an issue of fact and is otherwise admissible; courts should err on the side of admissibility if it would help the factfinder). We also note that father might have had strategic reasons to *not* object, lest Moto elaborate on an already adverse opinion, which is supported by father's choice not to cross-examine Moto. *See State v. Gornick*, 340 Or 160, 170, 130 P3d 780 (2006) (plain error review not appropriate where failure to object could have been strategic). Thus, we reject father's unpreserved arguments.

Because we conclude that there is no reversible error in assignments one through twelve, we also conclude that there is no reversible error in assignments thirteen through fifteen, which are predicated on those other assignments.

Affirmed.