Argued and submitted January 20, decision of Court of Appeals and judgments of circuit court affirmed November 10, 2022

In the Matter of A. B. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Respondent on Review,*

*v.*

F. J. M.,
*Petitioner on Review.*

(CC 20JU00943, CA A174486 (Control))

In the Matter of Z. K. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Respondent on Review,*

*v.*

F. J. M.,
*Petitioner on Review.*

(CC 20JU00944, CA A174487)

In the Matter of O. R. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Respondent on Review,*

*v.*

F. J. M.,
*Petitioner on Review.*

(CC 20JU00945, CA A174488)

In the Matter of K. J. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Respondent on Review,*

*v.*

F. J. M.,
*Petitioner on Review.*

(CC 20JU00946, CA A174489)

In the Matter of F. M.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Respondent on Review,*

*v.*

F. J. M.,
*Petitioner on Review.*

(CC 20JU00947, CA A174490)

(SC S068704)

520 P3d 854

The juvenile court took jurisdiction of mother and father's five children on the ground that their welfare was endangered and ordered father to complete a psychological evaluation and to follow its recommendations. Father appealed, contending that the juvenile court had erred in ordering that he participate in a psychological evaluation. The Court of Appeals affirmed. *Held*: (1) Even though the plain meaning of the term "treatment" in ORS 419B.387 is broad enough to encompass evaluation and testing components and the statute's legislative history is consistent with construing the term "treatment" broadly, a juvenile court's authority to order "treatment" is circumscribed by the statutory requirement that treatment be "needed" by the parent for the purpose of ameliorating the circumstances that resulted in the wardship or preparing the parent to resume care of the ward; (2) in determining whether treatment is "needed" by the parent, a juvenile court must engage in a fact-specific inquiry that depends on the circumstances of each individual case, and its finding of need must be grounded in the evidence presented at the evidentiary hearing and connected more than tenuously to the jurisdictional bases that the treatment is being ordered to correct; (3) the juvenile court found, based on the record, that father's behavior—in particular, his pattern of leaving the children in mother's care despite his awareness that she is an unsafe parent—is a reflection of a problem for which treatment *is* "needed," and that a psychological evaluation is necessary to correct that problem, which had resulted in the wardship of father's children, and to prepare him to resume the children's care; and (4) even though father had voluntarily participated in a psychological evaluation that had been recommended by his counselor, the juvenile court was not precluded from independently finding, consistently with ORS 419B.387, that father needed to participate in a psychological evaluation and follow its recommendations to correct the circumstances that resulted in wardship or to prepare father to resume the care of his children given that the record did not reflect any findings from father's voluntary evaluation or, more importantly, what recommendations were made to father or his actions in response to those recommendations.

The decision of the Court of Appeals and the judgments of the circuit court are affirmed.

On review from the Court of Appeals.*

––––––––––––

* On appeal from Malheur County Circuit Court, Lung S. Hung, Judge. 312 Or App 301, 493 P3d 59 (2021).

Sarah Peterson, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs was Shannon Storey, Chief Defender.

Jon Zunkel-deCoursey, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Walters, Chief Justice, and Balmer, Flynn, Duncan, Nelson, and Garrett, Justices, and Kistler, Senior Judge, Justice pro tempore.**

GARRETT, J.

The decision of the Court of Appeals and the judgments of the circuit court are affirmed.

_____

** DeHoog, J., did not participate in the consideration or decision of this case.

**GARRETT, J.**

In this dependency case, father challenges the juvenile court's order that he undergo a psychological evaluation and follow its recommendations. ORS 419B.387 authorizes a juvenile court, following an evidentiary hearing, to "order [a] parent to participate in the treatment or training" that "is needed by [the] parent to correct the circumstances that resulted in wardship or to prepare the parent to resume the care of the ward" and that "is in the ward's best interests." Father contends that the psychological evaluation that the juvenile court ordered does not qualify as "treatment" and that, even if it does, it was not "needed" by father. Thus, we must determine the meaning of those terms in ORS 419B.387 and whether that statute authorized the juvenile court to order the psychological evaluation at issue here. For the reasons explained below, we conclude that the juvenile court's order was authorized under ORS 419B.387. Accordingly, we affirm the decision of the Court of Appeals and the juvenile court's judgments.

We briefly set out the pertinent background facts, which are uncontested, and provide additional details later as necessary to address the parties' arguments on review.

Father and mother have five children together who, at the time of the hearings in this case in the summer of 2020, ranged in age from approximately 13 years to six months. DHS had been involved with the family for many years. The four older children were made wards of the court in 2017 because of mother's mental health issues and her violent behavior toward father, and because of father's failure to protect the children from exposure to domestic violence. Although the court granted legal custody to DHS, father retained physical custody of the children through an in-home placement. Court orders had prohibited mother and father from having contact, but they continued to engage with one another. During that time, father filed for dissolution, alleging that mother should not be granted parenting time because mother's mental health prevented her from safely parenting the children. Eventually, the state moved to dismiss the dependency proceedings because "DHS [could not] safely work [an] in home plan," and the court granted

the motion. Mother and father then voluntarily stipulated to the dismissal of the dissolution proceeding. DHS continued to have contacts with the family.

In mid-2019, the oldest child reported allegations of neglect. DHS initiated another assessment based on concerns that mother's mental health was affecting her ability to safely parent and that father was not taking appropriate measures to mitigate that threat of harm. Father was unwilling to work with DHS on an in-home safety plan. DHS closed its assessment after the juvenile court declined to issue an order permitting the removal of the children.

In January 2020, the events that gave rise to this case took place. While mother was caring for all five children, she threatened herself with a knife. Father, who was at work at the time, immediately returned to the family's home, after the oldest child explained to him what was happening. The police removed mother from the house. DHS again initiated an assessment and sought to work with father on an in-home safety plan.

About a month later, father, who was on probation for misdemeanor telephonic harassment of mother, failed to report to his probation officer. Father eventually submitted to a urine test, which revealed that he had used methamphetamine in violation of his probation. Father served a sanction of six days in jail. At that point, DHS took custody of the children and filed the dependency petitions that are at issue here. The children were placed in foster care.

The jurisdictional and dispositional hearings took place over a period of several weeks in June and July 2020. The juvenile court took jurisdiction of the children on the ground that their welfare was endangered. Specifically, the court found that DHS had proved jurisdictional allegations pertaining to father that concerned his substance abuse and a pattern of behavior that had existed for several years in which he left the children in mother's care even though he knew that she could not safely parent them.[1]

---

[1] Mother admitted to a jurisdictional allegation and stipulated to the proposed disposition. She is not a party on review.

After taking jurisdiction, the court held a dispositional hearing, incorporating the evidence from the jurisdictional hearing. The juvenile court continued the children's placement in substitute care and established a case plan of reunification with a concurrent plan of adoption. The court declined to require father to complete a mental health evaluation because it had not found that father "had any diagnosed mental health issues that a mental health evaluation and treatment would benefit." Instead, among other things, the court ordered father to complete drug and alcohol and psychological evaluations and to follow their "recommendations." Father did not object to the drug and alcohol evaluation, but he did object to the order concerning the psychological evaluation.

Father appealed the resulting judgments, contending that the juvenile court had erred in ordering that he participate in a psychological evaluation. *Dept. of Human Services v. F. J. M.*, 312 Or App 301, 493 P3d 59 (2021).[2] The Court of Appeals noted that, under its own case law, it had identified two potentially applicable statutes under which a juvenile court could order a psychological examination. *See Dept. of Human Services v. L. J. W.*, 302 Or App 126, 132, 460 P3d 540, *rev den*, 367 Or 75 (2020) ("Both ORS 419B.337(2) *and* ORS 419B.387 provide authority for a psychological examination. [ORS 419B.337(2)] requires that a psychological examination rationally relate to a jurisdictional basis, while [ORS 419B.387] requires a showing of a need for the examination for treatment or training directed toward reunification." (Emphasis in original.)). Noting that the juvenile court's statements referenced both standards, the Court of Appeals concluded that, viewing the juvenile court's findings and the record as a whole, the juvenile court had authorized father's psychological evaluation with a rationale that satisfied ORS 419B.387; as a result, the court

---

[2] In addition, father raised numerous assignments of error challenging the juvenile court's exercise of its dependency jurisdiction. The Court of Appeals "affirm[ed] the jurisdictional and dispositional determinations without discussion and [wrote] only to address father's challenge to the court's requirement that he submit to a psychological evaluation." *F. J. M.*, 312 Or App at 304. The only issue before us on review concerns the court's order that father submit to a psychological evaluation.

did not address whether the order would have been lawful under ORS 419B.337.[3] *F. J. M.*, 312 Or App at 311, 312 n 3.

In determining that the juvenile court's order was authorized under ORS 419B.387, the Court of Appeals relied on its prior decision in *Dept. of Human Services v. D. R. D.*, 298 Or App 788, 450 P3d 1022 (2019). That court explained that it had "concluded in *D. R. D.* that a psychological evaluation is authorized under ORS 419B.387 if needed 'as a component of treatment or training[,]'" but that the statute "'does not imbue the juvenile court with authority to order a parent to comply with a discovery mechanism to determine *if* there is a need for treatment or training.'" *F. J. M.*, 312 Or App at 310 (quoting *D. R. D.*, 298 Or App at 799-800 (emphasis in *D. R. D.*)). Applying that standard in this case, the Court of Appeals concluded that the juvenile court had not authorized "a psychological evaluation as a tool to discover what types of training or treatment were appropriate, which would not be allowed under *D. R. D.*," but, instead, had concluded that "a psychological evaluation would be helpful to father's success in the training and treatment that had been ordered to allow father to resume caring for the children." *F. J. M.*, 312 Or App at 311. Specifically, the Court of Appeals explained:

> "[G]iven the family's long history of involvement with DHS and father's long-term failure to address the need to protect the children from mother, the court determined that it would be important to know whether psychological factors were in play, so that the ordered training could better address father's deficits and help him to function as a parent and resume care of the children."

*Id.* at 311-12.

Judge Aoyagi concurred in part and dissented in part. She noted that, in recent years, the Court of Appeals had "seen more and more challenges to juvenile court orders

---

[3] After issuing its decision in *F. J. M.*, the Court of Appeals issued a decision in *Dept. of Human Services v. W. C. T.*, 314 Or App 743, 501 P3d 44 (2021). In *W. C. T.*, that court harmonized various lines of its own case law and several statutory standards, including those in ORS 419B.337(2) and ORS 419B.387, to recognize a four-part standard under which a juvenile court may order a psychological evaluation. This case does not concern that newly recognized standard.

requiring parents to submit to psychological evaluations, often with confusing records as to whether the court was relying on ORS 419B.337(2), ORS 419B.387, or both." *F. J. M.*, 312 Or App at 314 (Aoyagi, J., concurring in part and dissenting in part). In Judge Aoyagi's view, the juvenile court had not relied on ORS 419B.387, but instead had erroneously ordered the psychological evaluation under ORS 419B.337(2). *Id.* at 312-13. Father filed a petition for review in this court, which we allowed.

Before turning to the parties' arguments on review, we begin with a general overview of the statutory framework of which ORS 419B.387 is a part. ORS chapter 419B provides the juvenile court with "unique authority over the life of a child who comes before it, beginning with the authority to determine that a particular child falls within one of the categories specified in ORS 419B.100(1)—a determination that requires the court to make the child a ward of the court." *Dept. of Human Services v. C. M. H.*, 368 Or 96, 104, 486 P3d 772 (2021) (internal quotation marks omitted); *see also* ORS 419B.100(1)(c) (providing, in part, that "the juvenile court has exclusive original jurisdiction" in any case involving a child "[w]hose condition or circumstances are such as to endanger the welfare of the [child]"). Once a child has become a ward of the court, "a series of complex statutes and proceedings come into play" that "seek to protect the safety and well-being of children" and "the rights of both children and parents." *Dept. of Human Services v. S. J. M.*, 364 Or 37, 50, 430 P3d 1021 (2018); *see* ORS 419B.090(2)-(4) (describing the statutory and constitutional rights of parents and children).

Except in cases of extreme conduct under ORS 419B.502, it is the policy of the state "to offer appropriate reunification services to parents and guardians to allow them the opportunity to adjust their circumstances, conduct or conditions to make it possible for the child to safely return home within a reasonable time." ORS 419B.090(5). When the juvenile court places a ward in the legal custody of DHS, the juvenile court has authority to "specify the particular type of care, supervision or services to be provided by [DHS] to wards placed in [DHS's] custody and to the parents or guardians of the wards"; however, "the actual planning and

provision of such care, supervision or services is the responsibility of [DHS]." ORS 419B.337(2).

Further, parents and guardians owe duties to their children. For example, parents or guardians have a duty "to afford their children" the legal rights to "[p]ermanency with a safe family," "[f]reedom from physical, sexual or emotional abuse or exploitation," and "[f]reedom from substantial neglect of basic needs." ORS 419B.090(2)(a), (b). Parents also have a duty "to remove any impediment to their ability to perform parental duties that afford these rights to their children." ORS 419B.090(2)(b).

In particular circumstances, the juvenile court has authority to order parents and guardians to take certain actions. *See, e.g.*, ORS 419B.845(1)(a) (move from household in which the child resides if alleged to have physically or sexually abused the child); ORS 419B.112(6) (pay the reasonable costs of court appointed special advocate services, including reasonable attorney fees); ORS 419B.198(1) (pay the administrative costs of determining ability to pay for legal services and the costs of legal and other services related to the provision of appointed counsel to represent the child or ward); ORS 419B.400(1) (pay costs of support); ORS 419B.385 (assist in providing counseling and education for the ward). The court also has authority to enforce its orders by force of contempt. *See* ORS 419A.180 (providing that, "[i]n case of failure to comply with any order of the juvenile court, the court may proceed for contempt of court against the person failing to comply"); ORS 419B.929 (providing that "[a] court may enforce an order or judgment directing a party to perform a specific act by punishing the party refusing or neglecting to comply with the order or judgment, as for a contempt as provided in ORS 33.015 to 33.155").

As pertinent here, ORS 419B.387 authorizes the court to order a parent to participate in "treatment or training" that is "needed by [the] parent to correct the circumstances that resulted in wardship or to prepare the parent to resume care of the ward[.]" Although father contends that ORS 419B.387 is "the sole source of the juvenile court's authority to order a parent to participate in corrective services" and that "[t]he legislature did not intend, as the Court

of Appeals repeatedly has held, for *both* ORS 419B.337(2) *and* ORS 419B.387 to authorize the court" to issue orders directed at a parent, we need not resolve that issue in this case. (Emphases in original.) That is so because DHS has disclaimed any reliance on ORS 419B.337(2) "as an alternative source of authority for the juvenile court's order." Thus, as presented by the parties' arguments here, the sole issue is what ORS 419B.387 requires and whether the court's order in this case complied with those requirements. Specifically, the parties raise competing contentions concerning the meaning of the term "treatment" and the phrase "needed by the parent."

Father contends that the term "treatment" in ORS 419B.387 refers to "activities designed to cure deficits * * * and do[es] not mean completion of other tasks or submission to free-standing investigatory procedures or forensic examinations" like "submit[ting] to a polygraph," "a forensic psychological evaluation," "drug testing," or "any other free-standing task or investigatory procedure." Based on that understanding, father argues that the juvenile court erred in ordering him to participate in a psychological evaluation for two reasons. First, father argues that the compelled psychological evaluation does not qualify as "treatment" under ORS 419B.387 because "it is not a curative intervention designed to remedy a malady of the mind or body or any other deficit."[4] Second, father argues that he "had already participated in a psychological evaluation at the recommendation of his treating mental health therapist to guide and enhance his ongoing course of mental health treatment"; thus, he "had already secured the psychological evaluation that *he* needed" and the court's order "requiring father to submit to an additional, court-ordered evaluation for [*DHS's*] benefit was improper" under ORS 419B.387. (Emphases in original.)

---

[4] Father also contends that a psychological evaluation is not a form of "training." *See Webster's Third New Int'l Dictionary* 2424 (unabridged ed 2002) (defining the term "training" to mean, among other things, "the teaching, drill, or discipline by which powers of mind or body are developed : EDUCATION" and "development of a particular skill or group of skills"). However, because the gravamen of DHS's argument in this case is that the term "treatment" can encompass a psychological evaluation, and because we conclude that DHS is correct, we need not address whether such an evaluation is a form of "training."

In response, DHS contends that needed treatment covers more than direct, curative treatment and that "ORS 419B.387 authorizes the court to order a psychological evaluation if it finds that the evaluation would help it determine what treatment or training is needed to correct the circumstances that resulted in wardship or to enable the parent to resume care of the ward." DHS reasons that "treatment" often encompasses "diagnostic steps to determine the most effective course of action." DHS further explains that, when "a court is determining the 'treatment' for circumstances such as substance abuse or domestic violence," a psychological evaluation may be a necessary diagnostic tool that assists in tailoring treatment and services, or in "determin[ing] what other treatments [are] needed," to "correct the circumstances that resulted in wardship or to prepare the parent to resume care of the ward," as required by ORS 419B.387.[5]

To resolve the parties' contentions, we must interpret ORS 419B.387. When interpreting a statute, our goal is to determine the legislature's intent by examining the statutory text in context along with any legislative history that appears useful to our analysis. *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009).

We begin with the text of ORS 419B.387, which provides:

> "If the court finds in an evidentiary hearing that treatment or training is *needed by a parent* to correct the circumstances that resulted in wardship or to prepare the parent to resume the care of the ward, the court may order the parent to participate in the *treatment* or training if the participation is in the ward's best interests."

(Emphases added.) As noted, the parties' contentions raise two issues: (1) whether a psychological evaluation can be "treatment"; and (2) what it means for "treatment" to be "needed."

---

[5] Alternatively, DHS contends that, even if ORS 419B.387 did not authorize the juvenile court's order, it was nevertheless lawful as an exercise of the court's inherent authority. Because we conclude that the court's order in this case was authorized by ORS 419B.387, we need not address that issue.

Where, as here, the terms "treatment" and "needed" are not defined by statute, we assume that the legislature intended to give words of common usage their plain, natural, and ordinary meanings. *See Kinzua Resources v. DEQ*, 366 Or 674, 681, 468 P3d 410 (2020) ("When the legislature has not specially defined a term of common usage, we generally assume that the legislature intended to use the term in a manner consistent with its plain, natural, and ordinary meaning, and we often consult dictionaries for guidance in determining what the legislature would have understood a term to mean." (Internal quotation marks omitted.)). The term "treatment" has a variety of meanings, including "the action or manner of treating a patient medically or surgically," "the action or manner of dealing with something often in a specified way," or "preventive guidance and corrective training esp. of juvenile delinquents and youthful criminal offenders." *Webster's Third New Int'l Dictionary* 2435 (unabridged ed 2002); *see also id.* (defining the verb "treat," among other things, to mean "to care for (as a patient or part of the body) medically or surgically **:** deal with by medical or surgical means **:** give a medical treatment to" or "to seek cure or relief of (as a disease)").

Based on those definitions, father's primary argument is that a "psychological evaluation" is a "free-standing task or investigatory procedure" that is not "curative of a mental or physical condition." Although father is correct that one plain meaning of the term "treatment" narrowly refers to direct, curative interventions, the term can also refer to "the action or manner of dealing with something often in a specified way" or to "preventive guidance and corrective training." *Id.* As DHS contends, those plain meanings are broad enough to encompass evaluation and testing components. Among other things, such components can assist (1) in determining the cause or nature of the circumstances resulting in wardship, (2) in managing those circumstances, (3) in tailoring how a treatment can be effectively delivered, (4) in gauging a treatment's effectiveness, and (5) in identifying other treatment components.

The statute's legislative history supports that understanding. ORS 419B.387 was enacted in 1993. Or Laws 1993, ch 546, § 55. ORS 419B.387 replaced two other

provisions that had authorized the juvenile court to order a parent to participate in "educational or counseling programs" and "alcohol or drug treatment programs." *Former* ORS 419.507(8)(b), (c) (1991).[6] According to Judge Stephen Herrell, the law at the time restricted courts to ordering "parent training and alcohol and drug treatment," and the purpose of ORS 419B.387 was to "broaden[] the authority of the court to require parents to obtain treatment and training to prepare them to resume their child's care." Testimony, Senate Committee on Judiciary, SB 1051, Apr 21, 1993, Ex C (statement of Judge Stephen B. Herrell, Chair of the Juvenile and Family Justice Project). Thus, although the legislative history of ORS 419B.387 sheds little light on the precise meaning of the term "treatment," the stated purpose to "broaden[] the authority" of the juvenile court is consistent with construing the term "treatment" broadly to include evaluation and testing components. *See* ORS 174.020(3) ("A court shall give the weight to the legislative history that the court considers to be appropriate.").

However, it is evident from the plain text of ORS 419B.387 that a juvenile court's authority to order "treatment" is not unlimited. Several requirements must be satisfied before the juvenile court can order a parent to participate in treatment. As pertinent here—and contrary to father's assertion that "free-standing testing and evaluation[s]" are ordered "for purposes of the litigation itself" and for the use and benefit of the "government"—the juvenile court must find that the ordered treatment or training is "*needed by [the] parent* to correct the circumstances that resulted in wardship or to prepare the parent to resume the care of the ward." ORS 419B.387 (emphasis added).[7] As used in the statute, treatment is "needed" if it is necessary

---

[6] In 1993, the legislature repealed *former* ORS 419.507(8)(b) and (c) (1991) but then re-enacted the text of those provisions. Or Laws 1993, ch 33, § 373 (repealing *former* ORS 419.507), § 119 (re-enacting *former* ORS 419.507(8)(b)), § 120 (re-enacting *former* ORS 419.507(8)(c)). That same year, the legislature passed another bill that repealed the re-enacted provisions and replaced them with ORS 419B.387. Or Laws 1993, ch 546, §§ 54, 55. Further, ORS 419B.387 was later amended in 2003 in ways that are not material to our review. Or Laws 2003, ch 396, § 69.

[7] ORS 419B.387 also requires that the court hold an evidentiary hearing and that the parent's participation in treatment or training be in the ward's best interests. Those requirements are not at issue in this case.

or required. *See Webster's* at 1512 (defining the verb "need," among other things, to mean "to be needful **:** be necessary" and " to be in need of **:** have cause or occasion for **:** REQUIRE"); *id.* (defining the noun "need," among other things, to mean "a want of something requisite, desirable, or useful"); *id.* at 1510 (defining the adjective "necessary" to include "that is or exists or comes to be by reason of the nature of being and that cannot be or exist or come to be in any other way" and "of, relating to, or having the character of something that is logically required or logically inevitable").

The legislature's use of the term "needed" demonstrates an intent to circumscribe the juvenile court's authority and prevent a court from ordering evaluations and testing in every case to determine *if* a parent has a need for treatment. *See D. R. D.*, 298 Or App at 799 ("ORS 419B.387 does not imbue the juvenile court with authority to order a parent to comply with a discovery mechanism to determine *if* there is a need for treatment or training." (Emphasis in original.)). The legislature further circumscribed the juvenile court's authority by requiring that the ordered treatment be needed by the parent for a particular purpose—that is, the purpose of ameliorating the circumstances that resulted in the wardship or preparing the parent to resume care of the ward. However, even though what is "needed" is often a matter of degree, the legislature did not impose a requirement of absolute need in the sense that the juvenile court must find that it would be impossible for the parent to correct the circumstances resulting in wardship without engaging in the ordered treatment.

Thus, as with many other questions, in determining whether treatment is needed by the parent, a juvenile court must engage in a fact-specific inquiry that depends on the circumstances of each individual case, and its finding of need must be grounded in the evidence presented at the evidentiary hearing. In making that finding, a juvenile court may typically consider a variety of factors, such as (1) the circumstances that resulted in wardship (*e.g.*, substance abuse, mental health issues, other circumstances); (2) the extent to which the treatment that the court is considering will correct those circumstances or otherwise prepare the parent to resume the ward's care; (3) the availability of

alternatives to the treatment that the court is considering that will correct the circumstances that resulted in wardship or otherwise prepare the parent to resume the ward's care; (4) the effectiveness of a parent's prior attempts, if any, to ameliorate those circumstances; and (5) the length of time over which those prior attempts were made. We construe the statute to require that a juvenile court's finding that particular treatment (*e.g.*, a psychological evaluation) is *needed* by the parent must be connected more than tenuously to the jurisdictional bases that the treatment is being ordered to correct, and that it must be based in and supported by the evidentiary record. As we have explained, the circumstances of each case must be evaluated independently.

With that understanding of the statute, we return to the circumstances of this case to determine whether the juvenile court's order was authorized by ORS 419B.387. As noted above, the court held jurisdictional and dispositional hearings. At those hearings, the juvenile court took evidence concerning (1) the family's history with DHS, as previously described, 370 Or at 437-38; (2) father's voluntary mental health counseling; (3) father's drug use; and (4) father's failure to cooperate with the in-home safety plans designed to protect the children from mother.

At the time of the hearings, father had been voluntarily engaged in mental health counseling. Father testified that his counselor had suggested that he complete a psychological evaluation as a treatment recommendation. When the attorney for DHS asked father why he wanted a psychological evaluation, father explained, "[B]etween [my counselor] and I it was suggested that maybe it would be something good for myself to kind of find out why *** I am the way I am[.]" Father later testified that he had completed the psychological evaluation, but that his attorney had advised him not to share the results with DHS.

Father also had been receiving outpatient substance abuse treatment since his release from jail in February 2020. However, father had continued to associate with known drug users and to use methamphetamine up to the time of the hearings. Father would leave the children in a babysitter's or mother's care and was "usually not at home"

when he took the drug. As a result of father's continued drug use, his substance abuse counselor had recommended that he obtain inpatient treatment. An inpatient treatment program had been identified for father; however, he had not participated in the program at the time of the hearings. Casad, a DHS child protective services worker, testified that, in her discussions with father, he initially downplayed his drug use. Because father was "contradicting himself," Casad could tell that he "was not being honest with [her]." According to Casad, when she confronted father about his honesty, he said, "'I don't know how. I don't know how to do that. This is just *** how I was raised and I don't know how to fix it.'" Casad told father that, although father and his family had "had a lot of different resources and services," he "push[es] that help away" because "[he's] not honest." Father responded that Casad was "'right'" and again explained "'[t]hat's how I grew up'" and "'I don't know how to fix it.'"

According to father, if the children were returned to his care, he would not let mother "come around." However, he also believed that there are times that mother could safely parent the children on her own. He further testified that he is able to recognize when mother is capable of parenting the children safely and when she is not. However, Casad testified that father has a pattern of leaving "his kids home with [mother] and she is an unsafe care provider" with "unmanaged mental health issues that have *** made a major negative impact on his children." DHS presented evidence that, as a result, four of the children have severe emotional issues. Further, there was evidence that parents had an ongoing relationship in which they remained involved with one another. Specifically, Russell, a DHS permanency worker, recounted a phone call that had occurred during the course of the hearings in which she overheard father speaking angrily to mother.

The juvenile court found that DHS had proved the following jurisdictional allegations: (1) "father's substance abuse interferes with his ability to safely parent the child[ren]"; (2) "father knew that mother's mental health prevented her from safely parenting the child[ren] and he continued to leave the child[ren] in [her] care"; and (3) "[f]ather has displayed a pattern of behavior over several

years where he leaves the child[ren] in the care of * * * mother knowing that she cannot safely parent [them]." Specifically, the court found that "[f]ather['s] drug abuse continues to be a condition that harms the children" and that "his addiction has hurt his family financially and also caused him to check out from being able to raise the children for periods of time." As the court noted, "father has continued to use and continues to associate with known drug users." The court also found that "mother's presence ha[d] had a substantial negative affect on [the] children" and that the evidence demonstrated "a repeating cycle where father continues to separate and get back together with mother and when they are together, father leaves the children with mother or allows mother to be with [the] children." The court acknowledged that father had stated that "he does not want mother around the children and wants to raise them on his own." However, "[g]iven the historical repeating cycle and there being reason to question * * * father's credibility," the juvenile court expressly did "not find [that] father will protect his children from mother." The court explained that "[t]he overheard conversation between mother and father by a DHS worker demonstrates [that] father is still very much intertwined with mother and will continue to be so."

At the dispositional hearing, DHS requested, among other things, that the court order father to submit to substance abuse, mental health, and psychological evaluations and to follow the resulting recommendations. DHS took the position that, in the six months since the children had entered foster care, father had struggled to engage in and complete "alcohol and drug treatment" and that DHS was requesting the psychological evaluation because of his "lack of progress" despite the services that had been offered. DHS further argued that the evidence at the jurisdictional hearing demonstrated that father has "mental health issues" and a "psychological impairment that needs to be addressed in order for him to be successful not only in a reunification plan, but his alcohol and drug treatment."

Father objected to the mental health and psychological evaluations, arguing that there was no "relevant basis" for such evaluations "under the allegations and the evidence

put before the [c]ourt." Father also contended that the court could not order the psychological evaluation because it was not "treatment or training needed by [father] to correct the circumstances" that had resulted in wardship.

In support of the requested psychological evaluation, Combs, a DHS supervisor, testified that the agency had received numerous reports "regarding this family since 2014" and that "a pattern of behavior" had emerged "that ha[d] played out over years of violence in the home, drug use, and instability." Combs also testified that father had previously "agreed to work with [DHS] in a prior case" but that "he struggled to maintain implementing the safety plan that he had agreed upon in the home." Combs explained that, based on the pattern of father's behavior and her own experience, father's "substance use has affected his mental health," but that DHS was "unsure about what his underlying mental health concerns may be and a psychological evaluation would help us guide case planning, reunification, and fully understand what his needs are."

The juvenile court ordered father to submit to a psychological evaluation and to follow the resulting recommendations. In doing so, the court explained:

> "There was ample testimony regarding * * * father's repeated attempts to separate himself or keep the children safe from * * * mother and repeated failures to do so, both by prior DHS cases, prior divorce filings, prior other things that were done either by [f]ather on his own or * * * with the assistance or urging of DHS that (indiscernible) simply failed to bring that forward at least until now.
>
> "And I think a psychological evaluation would be helpful in determining the rationally related (indiscernible) determine * * * what else needs to be done, what can be done to assure that [f]ather can keep the children safe and away from their mother. So I do find that [a] psychological evaluation is rationally related and based on both the evidence presented at adjudication and disposition."

Viewed in the context of the record and the juvenile court's other findings, we conclude that the juvenile court's order that father participate in a psychological evaluation and follow its recommendations was authorized under ORS

419B.387.[8] The court explained that, based on the evidence, father's substance abuse issues continue to harm the children, as does his longstanding inability to separate himself and keep the children safe from mother despite his own efforts and the "assistance or urging of DHS." That recognition is supported by record evidence that father, when confronted with his dishonesty during discussions with Casad about his drug use and his prior rejection of resources and services, acknowledged to her that he did not "'know how to fix it,'" and that father has been repeatedly unable to separate himself and keep the children safe from mother.

In other words, contrary to father's characterization, we do not view the juvenile court as having ordered a psychological evaluation as a discovery tool to determine *if* father had a need for treatment or training. Given the family's long history with DHS over the period of many years and father's inability to correct the circumstances that ultimately had resulted in the children's wardship, we understand the juvenile court to have found that father's behavior—in particular, his pattern of leaving the children in mother's care despite his awareness that she is an unsafe parent—is a reflection of a problem for which treatment *is* "needed," and that a psychological evaluation is necessary to correct that problem, which had resulted in the wardship of father's children, and to prepare him to resume the children's care. The record supports that finding.

That brings us to father's final argument. As previously noted, father had been voluntarily engaged in mental health counseling and, during the course of the juvenile court hearings, had participated in a psychological evaluation that had been recommended by his counselor. Thus, according to father, he did not need a psychological evaluation and the

---

[8] We note that, in ordering the psychological evaluation, the court referenced the need for a "rational basis" between the court's orders and the allegations that DHS had proved. As a general matter, we do not disagree with the juvenile court's statement that its orders must bear a rational relationship to the jurisdictional bases in the case before it; however, ORS 419B.387 requires a finding that the ordered treatment is needed by the parent. Although we are mindful of the press of court business, we encourage courts, when issuing orders under ORS 419B.387, to clearly explain why, based on the evidence, the ordered treatment *is needed by a parent to correct the circumstances that resulted in wardship or to prepare the parent to resume care of the ward.*

court's order that he participate in another one was based on DHS's need, not his.

Father testified that he began mental health counseling after he "reached out to [his] doctors to get back on [his] medication" for "[d]epression and anxiety" and his physician had "asked [him] if [he] wanted to do the counseling." When the children's attorney asked father what assurances he could give that "things would be different" if the children were returned to his care, father responded that he believed that he was no longer making "impulsive decisions" and that he now had a "support system" of professionals to assist him, which included his mental health counselor. Further, as noted, father's mental health counselor had suggested that he complete a psychological evaluation as a treatment recommendation, but we know little about the psychological evaluation that father voluntarily decided to complete. Father testified that the "trial" in this case "probably played a part" in his decision, and, at the hearing, his attorney explained that father sought the evaluation "for his own benefit and for his own purposes."

There may well be circumstances in which evidence that a parent has voluntarily undertaken a course of action would preclude a juvenile court from ordering that a particular form of treatment or training is "needed" by the parent. However, a parent's previous participation in an evaluation does not necessarily demonstrate that the parent no longer needs the evaluation as a component of treatment to correct the circumstances resulting in wardship. The record here reflects only that father underwent an evaluation; it does not reflect any findings from that evaluation or, more importantly, what recommendations were made to father or his actions in response to those recommendations. Thus, under the circumstances of this case, father's previous participation in a psychological evaluation for his own purpose—whatever that may have been—did not preclude the juvenile court from independently finding, consistently with ORS 419B.387, that father needed to participate in a psychological evaluation and follow its recommendations to correct the circumstances that resulted in wardship or to prepare father to resume the care of his children. Accordingly, for the reasons described, we conclude that the juvenile court's

order that father participate in a psychological evaluation and follow its recommendations was authorized by ORS 419B.387.

The decision of the Court of Appeals and the judgments of the circuit court are affirmed.