No. 7             March 28, 2024             133

IN THE SUPREME COURT OF THE
STATE OF OREGON

In the Matter of A. J. A.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Respondent on Review,*

*v.*

Y. B.,
*Petitioner on Review.*

(CC 19JU05194) (CA A178747) (SC S069996)

En Banc

On review from the Court of Appeals.*

Argued and submitted September 12, 2023.

Sarah Peterson, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section.

Robert Hansler, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Inge D. Wells, Assistant Attorney General.

MASIH, J.

The decision of the Court of Appeals and the judgment of the juvenile court are affirmed.

_____
* Appeal from Marion County Circuit Court, Tiffany Underwood, Judge. 323 Or App 322, 522 P3d 564 (2022).

**MASIH, J.**

In this case, mother challenges a determination made by the juvenile court under ORS 419B.476(2)(a) concerning the permanency plan for her child, A. In July 2019, A was made a ward of the court, committed to the legal custody of the Department of Human Services (DHS), and placed in substitute care.[1] Following a three-day permanency hearing in 2022, the juvenile court changed the permanency plan for A from reunification to guardianship, based on its determination that, despite DHS's reasonable efforts, mother had not made "sufficient progress" under ORS 419B.476(2)(a) to make A's safe return home possible. The Court of Appeals affirmed the juvenile court's ruling without a written opinion. *Dept. of Human Services v. Y. B.*, 323 Or App 322, 522 P3d 564 (2022). We allowed review to clarify the nature of the determination assigned to the juvenile court by ORS 419B.476(2)(a) and to address the related question of our standard of review for that determination.

For the reasons that follow, we now hold that the juvenile court's "sufficient progress" determination is a legal conclusion rather than a finding of fact, and we conclude that the record developed in this case is legally sufficient to support the juvenile court's legal conclusion that mother's progress was insufficient to make possible A's safe return home and to support the court's decision to change the permanency plan from reunification to guardianship. We therefore affirm the decision of the Court of Appeals and the judgment of the juvenile court.

## I. BACKGROUND

A. *Standard of Review*

DHS bears the burden of proof at a permanency hearing, and it must prove the facts supporting a change to the permanency plan by a preponderance of the evidence. ORS 419B.476(1) (requiring the permanency hearing to be conducted in accordance with ORS 419B.310); ORS 419B.310(3)(A) (requiring that "the facts alleged in the

---

[1] "Substitute care" is an out-of-home placement directly supervised by DHS or another agency and includes placement of a child in a foster family home, a group home, or another child-caring agency. ORS 419A.004(34)(a).

petition showing the child to be within the jurisdiction of the court *** must be established," as pertinent here, "[b]y a preponderance of competent evidence"); *Dept. of Human Services v. T. L.*, 358 Or 679, 692, 369 P3d 1159 (2016) (stating that "DHS has the burden to prove that a parent has not made sufficient progress to have the children returned despite its reasonable efforts").

In a dependency case in which we do not review *de novo*, we generally review the juvenile court's legal conclusions for errors of law,[2] and we consider the evidence in the light most favorable to the juvenile court's disposition to determine whether it supports that court's legal conclusions. *Dept. of Human Services v. S. J. M.*, 364 Or 37, 40, 57, 430 P3d 1021 (2018). In addition, we defer to the juvenile court's findings of fact if there is any evidence in the record to support them. *Id.* at 57 (affirming juvenile court ruling because "explicit and implicit factual findings, and the evidence in the record on which they were based, supported the juvenile court's legal conclusions"). And, as we discuss further below, we review a legal conclusion that is heavily fact-dependent—such as a juvenile court's determination of "sufficient progress"—to determine whether the evidence was sufficient to support it.

B.  *Historical Facts and Juvenile Court Jurisdictional Bases*

The events that led to this dependency proceeding began in July 2019. Mother left her son, A, who was then about 18 months old, with his regular babysitter for a couple of hours.[3] Mother returned to the babysitter's home with a pizza. When A wandered into the kitchen, where mother was preparing to bake the pizza, mother became angry and began yelling at him. She grabbed A's right arm and swung him around the kitchen while slapping him on the hands and head. The babysitter took A away from mother. Mother left the babysitter's home and did not come back that night. The next day, the babysitter called emergency

---

[2]  No party requested *de novo* appellate review as permitted by ORS 19.415(3)(b), either in the Court of Appeals or in this court, and we choose to review for errors of law. ORS 19.415(1).

[3]  A spent a great deal of time at the babysitter's home, including some overnight stays, to accommodate mother's shift-work schedule.

services because A's arm was swollen and he avoided moving it. A was transported to the hospital, and, because he was alone, authorities contacted DHS. At the hospital, medical personnel determined that A's arm was fractured. They also noted that the right side of his face was bruised and there were superficial abrasions on other parts of his body. They reported to the police that they suspected child abuse. DHS placed A in protective custody and filed a dependency petition alleging physical abuse and failure to attend to A's basic needs.[4] The juvenile court issued a shelter order based on DHS's petition, and it committed A to DHS's temporary custody for placement in substitute care.

Police and a Child Protective Services case worker investigated the circumstances of A's injuries and interviewed mother and the babysitter, among others. Mother denied that she had knowingly injured A, asserting, instead, that she walked him out of the kitchen with both hands over his head. Based on information provided by hospital staff and the babysitter, the Marion County District Attorney's Office charged mother by information with first-degree criminal mistreatment.

In September 2019, the juvenile court issued an order establishing dependency jurisdiction over A based on mother's admissions that she needed the assistance of the court and state to acquire the skills and training necessary to safely parent A and that the no-contact order resulting from the criminal charge prevented her from being a placement resource.[5]

In January 2020, mother was indicted on one count of first-degree criminal mistreatment and one count of fourth-degree assault. In August 2020, following a bench trial, mother was acquitted on the criminal mistreatment charge but convicted of fourth-degree assault. The trial court placed mother on probation and ordered her to complete an

---

[4] A's father was not available to parent A because he was serving a lengthy prison sentence. The juvenile court also asserted dependency jurisdiction due to father's unavailability to parent A because of father's incarceration. Father is not a party on appeal.

[5] The criminal court later amended the release agreement to allow mother to have supervised contact with A.

anger management assessment and to participate in parenting classes.

In October 2020, the juvenile court entered a supplemental dependency order, based on the stipulations of the parties, which amended the original order to reflect that "mother was convicted of recklessly causing physical injury to the child." The amended dependency order also dismissed the allegation concerning mother's failure to attend to A's basic needs. The order otherwise continued A's wardship, A's placement in substitute care, and the permanency plan of reunification. In addition, the court ordered mother to undergo a psychological evaluation and to participate in parenting classes and other recommended services.

Mother subsequently submitted to a psychological evaluation performed by Dr. Cook, who diagnosed mother with various mental health conditions. Cook recommended, among other things, that mother complete parenting classes and engage in mental health treatment focusing on emotional regulation and distress tolerance. Mother was also interviewed by Dr. Carter, a domestic violence evaluator, who concluded that, to parent A safely, mother needed to address her unresolved "significant trauma issues" stemming from events in her childhood and from her adult relationships with her domestic partners. Beginning in June 2021, mother began participating in trauma-based therapy with Dean, a licensed clinical social worker. In July 2021, she also began receiving one-on-one parenting coaching from Keiser, a parent educator.

In August 2021, mother seemed to be making progress in acquiring safe parenting skills, and DHS returned A—then three years old—to mother's care with in-home parenting coaching by Hummer, an in-home safety and reunification services specialist. Shortly thereafter, Hummer reported to DHS that mother was having difficulty parenting. During that time, DHS also received two calls on its emergency hotline concerning the family. Davis, the DHS child abuse investigator, responded. Mother told Davis that A would hit and kick her, and she acknowledged that she struggled to manage that behavior, because it triggered a trauma response in her. Mother reported that she

was having "near panic attacks" because of A's aggressive behavior toward her and that, on multiple occasions, she had locked herself in a room away from A or locked A in a room away from her. DHS also learned that, on one occasion, mother had tied A's arm from the shoulder with a jump rope to prevent him from hitting her and as a form of discipline. In September 2021, because DHS had determined that mother was having difficulty parenting A and that her actions presented a safety concern, DHS again removed A from mother's care. A had been in mother's care for about three weeks at that point.

After A was re-removed, DHS continued to provide mother with services aimed at reunification, including continued therapy with Dean and parent-child-interaction therapy with a new therapist, Irwin, which was designed to help mother and A with bonding, attachment, behavior, obedience, and parenting skills. DHS also facilitated supervised visitation with mother, including visits at mother's church and home to give her an opportunity to practice the skills that she was learning. Although mother actively and willingly engaged in the services that DHS provided to her, her progress was slow.

By February 2022, A had been in substitute care for over two and a half years, and DHS continued to have concerns about mother's parenting. Accordingly, DHS recommended that A's permanency plan be changed from reunification to guardianship. In arguing for that change, DHS focused on the length of time that A had been in substitute care, his multiple placements, the failed attempt to return A to mother's care, certain incidents in which mother became disproportionately upset with A over trivial matters, and mother's tendency to confuse A by not using direct, age-appropriate commands when asking him to do something.

C.  *The Permanency Hearing and Juvenile Court's Ruling*

The juvenile court conducted a permanency hearing over the course of three days in February and April 2022. The court heard testimony from Cook, Carter, Keiser, Hummer, Irwin, and Dean, as well as from DHS professionals who had interacted with mother and A, including

Rutherford, the family's primary caseworker, and Davis, the child abuse investigator. According to those witnesses, although mother had begun to show observable improvement in her ability to parent A effectively, she still had a long way to go before A could be safely returned to her care. The court also heard testimony from mother about her successful completion or active participation in training and services, implementation of training, and her plan for the return of A, which included, among other things, using her own mother (grandmother) as a babysitter or potential live-in safety service provider.

The juvenile court announced its ruling at the conclusion of the hearing. The court explained that, before it could change the permanency plan from reunification to guardianship, it would have to determine that DHS had made reasonable efforts to reunify the family but that mother had not made sufficient progress to allow A to be safely returned home. In addition, under ORS 419B.476(5)(e), if it were to determine that the permanency plan should be the establishment of a legal guardianship, then it also would be required to determine that neither placement of A with a parent nor changing the plan to adoption was appropriate.

The court first addressed whether DHS had made "reasonable efforts" to reunify the family, as required by ORS 419B.476(2)(a). The court described the services that DHS had provided to mother, including parent-child interactive training with Irwin, trauma therapy with Dean, parenting coaching with Keiser, parenting classes with Hummer, and referrals for eye movement desensitization and reprocessing therapy to address her trauma. The court determined that those services represented "reasonable efforts *** to make it possible for the ward to safely return home."

Turning to whether mother had made "sufficient progress" in safely parenting A, the juvenile court acknowledged that mother had made some progress, and it agreed that mother was "able to recite what she's learned in parenting classes [and] that she's able to show that she's absorbed it." However, the court concluded, mother "has not been able to put that [knowledge] into practice." The court noted that mother remained unwilling to accept that her actions

had led to A's removal and re-removal and that she did not acknowledge her role in his broken arm or "the gravity of tying [A] up with a jump rope." The court observed that, although mother had participated in trauma therapy, she had not focused on the traumas that led her to respond inappropriately to A's behavior and led Carter initially to refer her to trauma therapy; instead, she had focused on other traumatic experiences in her past that did not affect her parenting and had not been the primary basis for the referral. Moreover, the court noted, when mother was asked whether she intended to address the trauma that was affecting her parenting, "her response was vague and noncommittal."

The juvenile court also noted that, on multiple occasions during the attempted reunification, mother had locked herself away from A or turned her back on him and ignored him when she felt unable to cope with his behavior or his demands, noting that that response was deleterious to A's need and ability to form strong attachments to mother and, generally, to his emotional development. Additionally, the court expressed concern that mother's plan for the future included permitting the grandmother to care for A. Mother had obtained a restraining order against the grandmother in June 2019, after the grandmother, in the presence of A, attempted to strangle mother and slapped mother's then four-year-old daughter.[6] The court found that, despite the training and services that DHS had provided to mother and despite how eagerly and willingly mother had engaged in those services, "there is still a disconnect where mom doesn't quite get it, doesn't understand why it is a problem and a safety concern to permit somebody access to her child who has previously attempted to strangle her and has previously assaulted another." The court also pointed to mother's testimony that she had ignored the grandmother for a year after the attempted strangulation as a means to make the grandmother more sensitive to her and her children's needs. The court connected mother's response to the grandmother to evidence that mother ignored A when his demands or behavior overtaxed her, and it concluded that that "ignoring behavior appears to be something that[,] despite the

---

[6] The daughter lived with her father but had regular visitation with mother.

training and services that [mother] has received[, mother] still relies on believing that these ignoring behaviors are helpful, and that's not something [A] needs."

Ultimately, the court determined that a change in the permanency plan from reunification to guardianship was appropriate. In so concluding, the court stated, "I cannot conclude that [mother] has ameliorated the basis of jurisdiction such that [A] could return home within a reasonable time, as his health and [safety] are the top concern of the Court." The court observed that A had already been in substitute care "for over one thousand days." The court noted that Cook, who had performed three parental-assessment psychological evaluations on mother, the most recent of which had been in October 2021, had testified that mother would need continuing mental health therapy in order to be able to respond appropriately to parenting instruction, to reduce her "post-traumatic reactivity" to A's behavior, to meet A's needs, and to become a minimally adequate parent. Cook had opined that it would take between one and two years to accomplish those goals—"a substantial period of [A's] life."

For those reasons, the court concluded that, even though mother had made substantial progress, and despite DHS's reunification efforts, "[A] cannot be safely returned to [mother's] care at this time and the evidence does not support a determination that further efforts will make it possible for [A] to safely return home within a reasonable time." In that regard, the court observed, quoting from ORS 419A.004(26), that a "reasonable period of time" is measured by A's "emotional and developmental needs" and his "ability to form and maintain lasting attachments," and A had already spent most of his life in substitute care. The court then made the additional determination that ORS 419B.476(5)(e) requires when a court determines that the permanency plan for a ward should be changed from reunification to legal guardianship—namely, that placement with the ward's parents or adoption is not appropriate. It found that placement of A with a parent was not appropriate because, despite DHS's reasonable reunification efforts, A could not safely be returned to a parent within a reasonable time. It further found that, based on A's attachment to a parent, adoption would not be in A's

best interest. Finally, the court found that remaining in sub-
stitute care was necessary and in A's best interest. The court
subsequently entered a written judgment changing the per-
manency plan from reunification to guardianship.[7]

Mother appealed, challenging the juvenile court's
ruling, and, as noted, the Court of Appeals affirmed without
opinion.

## II.   THE PARTIES' ARGUMENTS ON REVIEW

On review, mother asserts that the juvenile court
applied an incorrect legal standard in making its "sufficient
progress" determination. As mentioned, the juvenile court, in
its oral ruling, stated, "I cannot conclude that [mother] has
ameliorated the basis of jurisdiction such that [A] could return
home within a reasonable time, as his health and [safety] are
the top concern of the Court." Pointing to that statement,
mother argues that the juvenile court held her to a standard
that ORS 419B.476(2)(a) does not require. Mother asserts
that that statute does not require a parent to have completely
ameliorated the bases for the wardship to avoid a change in
A's permanency plan. Rather, it requires sufficient progress
*toward* ameliorating the bases for the wardship to the extent
necessary to make the safe return of A to her care possible at
the time of the hearing or within a reasonable time after the
hearing. And, she argues, that is a question of law, not fact.

In addition, mother contends that DHS failed to
meet its burden to produce evidence sufficient to support
a determination that she had made insufficient progress
to permit A's safe return home. She asserts that many—if
not all—of the witnesses at the permanency hearing tes-
tified that mother had made significant progress. Mother
acknowledges that she will need continued services, but she
argues that that is not a reason to conclude that she had not
made sufficient progress.

DHS, for its part, contends that whether a par-
ent has made sufficient progress to make possible the safe
return of a child is a factual finding, not a legal conclusion,
and that this court must defer to the juvenile court's find-
ing in this case that mother had made insufficient progress

---

[7]  At the time of the hearing, no potential guardian had been identified.

if there is any evidence in the record to support it. DHS agrees that the correct inquiry at the permanency hearing was not whether the bases for dependency jurisdiction had been completely ameliorated, but, rather, whether A could safely be returned to mother's care at the time of the hearing or within a reasonable time thereafter. Here, however, DHS argues that there was ample evidence in the record to support the juvenile court's finding that, despite mother's efforts, A would not be safe in her care, even with continued support.

## III.   ANALYSIS

### A.   *Permanency Proceedings*

As we explained in *S. J. M.*, before interpreting the statutes at issue, it is helpful to place the permanency decisions at issue in the case in context. 364 Or at 50-51. When the juvenile court makes a child a ward of the court, a series of complex statutes and proceedings come into play. The statutes seek to protect the safety and well-being of children and the rights of the parents. *See* ORS 419B.090(2) - (4) (describing constitutional and statutory rights of children and parents). There is a "strong preference that children live in their own homes with their own families," and DHS is obligated, except in cases involving "extreme conduct," to work with families toward family reunification at the outset, ORS 419B.090(5); *see* ORS 419B.502 (concerning "extreme conduct"). But the statutes also recognize that "it is not always possible or in the best interests of the child or the public for children who have been abused or neglected to be reunited with their parents." ORS 419B.090(5). Children have a right to "permanency with a safe family," ORS 419B.090(2)(a)(A), and the state has an "obligation to create or provide an alternative, safe and permanent home for the child," ORS 419B.090(5). And, as this court stated in *S. J. M.*, "[t]hat right to permanency sometimes can conflict with a parent's interest in having additional time to make sufficient progress for the child to be safely returned home." 364 Or at 51.

The statutes governing permanency proceedings (ORS 419B.470 to ORS 419B.476) were enacted in response

to federal legislation establishing requirements for state substitute care and juvenile court systems, with the goal of reducing the length of time that children spend in substitute care. *T. L.*, 358 Or at 689. ORS 419B.470 requires the court to hold permanency hearings when a child is in substitute care and provides the deadlines for such hearings. The purpose of a permanency hearing is to determine, or update, the permanency plan for the child and to establish the timetable and conditions for accomplishing that plan. ORS 419B.476(2), (4), (5); *T. L.*, 358 Or at 689 (so stating). Permanency hearings provide court oversight of the permanency plan, DHS's efforts, and the parent's progress in making the child's safe return home possible.

B.   *The "Sufficient Progress" Determination*

ORS 419B.476 governs the conduct of permanency hearings and changes to permanency plans. That statute provides, in relevant part, that, at a permanency hearing, if the case plan at the time of the hearing is to reunify the family, the court "shall *** determine whether [DHS] has made reasonable efforts *** to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home." ORS 419B.476(2)(a). It also provides that, in making that determination, "the court shall consider the ward's health and safety the paramount concerns." *Id.* Thus, at a permanency hearing, the juvenile court reviews both DHS's efforts to provide services to the parent and the parent's progress in ameliorating the conditions that led to the child becoming a ward of the court to determine whether the child's safe return home is possible at the time of the hearing. If not, the court may determine that the permanency plan for the child should be something other than reunification, such as adoption, guardianship, or placement with a relative. ORS 419B.476(5)(b)(B) - (D).[8]

In addition, ORS 419B.476(4)(c) gives the juvenile court discretion to continue the current plan of reunification if it determines that further efforts may make possible the

_____

[8] For a child 16 years of age or older, the juvenile court also can order that the child be placed in "another planned permanent living arrangement." ORS 419B.476(5)(b)(E).

child's safe return "within a reasonable time" and, if it so determines, to order the parents to "participate in specific services for a specific period of time and make specific progress within that period of time[.]" Finally, ORS 419B.476(5)(e) provides that, if the determination is to change the plan to legal guardianship, then the court's order "shall include * * * the court's determination of why neither placement with parents nor adoption is appropriate."

The "progress" that a parent must make is in ameliorating, to the extent necessary to make possible the child's safe return to the parent's care, the circumstances that led the juvenile court to make the child a ward of the court. ORS 419B.476(2)(a) (court must determine whether the parent has made "sufficient progress" to make it possible for the ward to safely return home). "Progress" does not mean completely ameliorating the bases for dependency jurisdiction—inherent in the notion of "progress" is that the parent need not establish at the time of the hearing that wardship is no longer necessary and should be dismissed.[9]

Context supports that interpretation. For example, the definition of "substitute care" in ORS 419A.004 contemplates continuing DHS involvement with the family: ORS 419A.004(34)(b)(C) excludes from the definition of "substitute care," "[i]n-home placement subject to conditions or limitations[.]" DHS regulations also reflect that understanding. For instance, OAR 413-040-0017(1) provides, in part, that a caseworker may recommend "returning the child * * * to a parent" when the caseworker has verified that the "identified impending danger safety threats can be managed with an ongoing safety plan."

Thus, we agree with mother and the state that a parent can be found to have made sufficient progress to warrant the denial of a DHS request to change the permanency plan away from reunification even if further services would be required were the child to be returned home, and even if

---

[9] Jurisdiction is based on proof by a preponderance of the evidence of the facts alleged in the petition to make the child a ward of the court. ORS 419B.100; ORS 419B.310(3)(a)(A). Thus, dependency jurisdiction will be dismissed only if the conditions or circumstances giving rise to the court's jurisdiction have been completely ameliorated and DHS involvement is no longer necessary.

the child will remain in the legal custody of DHS and sub-
ject to the juvenile court's ongoing supervision.

C.   *Nature of the Determination*

      The juvenile court determined that DHS had made
reasonable efforts but that mother had not made sufficient
progress "to make it possible for the ward to safely return
home." The parties disagree about whether that "sufficient
progress" determination is a finding of fact or a legal con-
clusion, and they contend that whether the juvenile court's
permanency ruling should be affirmed depends upon that
distinction. We agree that the distinction is important: As
previously discussed, we accept the juvenile court's findings
of fact if there is any evidence in the record to support them,
but we review legal conclusions for errors of law.

      DHS points out that this court suggested, in *S. J. M.*,
that both the reasonable-efforts and sufficient-progress
determinations are findings of fact:

> "In these cases, the juvenile court found that DHS had
> made reasonable efforts to reunite L and A with their
> parents. Those findings were not challenged. The juvenile
> court also made findings, unchallenged here, that mother
> and AJB had not made sufficient progress to allow them to
> be reunited with their children."

364 Or at 57. DHS relies on this court's reference to "findings"
in *S. J. M.* to infer that we have already held that "sufficient
progress" is a factual finding. However, that issue was not
presented in *S. J. M.* The fact that our opinion in that case
happened to use the word "findings" in passing to describe
the nature of the determination does not reflect any consider-
ation of the issue before us here, and we give it little weight.

      Mother, meanwhile, points to numerous Court of
Appeals decisions holding that "sufficient progress" is a
question of law. *See, e.g.*, *Dept. of Human Services v. C. H.*,
327 Or App 61, 63, 533 P3d 1112 (2023) (so stating); *Dept.
of Human Services v. C. W.*, 312 Or App 572, 574, 493 P3d 74
(2021) (same); *Dept. of Human Services v. G. N.*, 263 Or App
287, 294, 328 P3d 728 (2014) (same). Although those cases
are not controlling in this court, mother contends that they
correctly construe the statute.

Whether "sufficient progress" is a question of fact or law depends on its function within the statute. To determine that function, we consider the wording of the statute as a whole and the context in which that phrase is used, as well as the nature of the determination assigned to the juvenile court. *See State v. A. R. H.*, 371 Or 82, 89, 530 P3d 897 (2023) (applying similar methodology to resolve whether juvenile court determination, under ORS 163A.030, that youth was not rehabilitated and must report as a sex offender, is finding of fact or conclusion of law).

Turning first to the wording of the statute, we observe that ORS 419B.476 does not direct the juvenile court to "find" or make "findings" of reasonable efforts or sufficient progress. Rather, it directs the juvenile court to "determine" whether DHS's efforts were reasonable and whether the parent's progress was sufficient to make it possible for the child to safely return home. The word "determine" is ambiguous and the use of that word rather than the word "find" does not resolve the issue. However, this court has stated that the terms "reasonable" and "sufficient" are important indicators that determinations are legal and not factual:

> "We acknowledge the temptation to treat indefinite terms like 'good cause,' 'sufficient reason,' and 'reasonable period of time' as calling for a subjective determination and, thus, as invoking personal judgment. However, it is clear that, when such terms appear in a statutory context, they are focused on real, albeit sometimes difficult to discern, legal standards: the *legislature's* view of what is 'good,' 'sufficient,' or 'reasonable.'"

*State v. Johnson*, 339 Or 69, 86, 116 P3d 879 (2005) (emphasis in original).

Thus, the text of the statute suggests that the juvenile court's determinations of "reasonable efforts" and "sufficient progress" are legal conclusions. Statutory context lends some support to that interpretation. Under ORS 419B.100, the juvenile court has dependency jurisdiction in cases involving, among others, a person "[w]hose condition or circumstances are such as to endanger the welfare of" that person. ORS 419B.100(1)(c). Whether the person's conditions or circumstances endanger the person's welfare is a

legal determination, not a factual finding. That is, the role of the juvenile court in a proceeding under ORS 419B.100(1)(c) is to determine whether the facts as alleged and proved by DHS establish the court's authority to create or continue the legal relationship between the child and the state as required for wardship. *See, e.g.*, *Dept. of Human Services v. N. P.*, 257 Or App 633, 639-40, 307 P3d 444 (2013) (a juvenile court's determination of dependency jurisdiction, predicated on its determination under ORS 419B.100(1)(c) that a parent's condition at the time of the hearing does or does not present a risk of harm to a child, is a legal conclusion). Similarly, under ORS 419B.476, "reasonable efforts" and "sufficient progress" describe the legal standard that must be met to justify the juvenile court's decision to maintain or change the permanency plan of a ward of the court.

Consideration of the nature of the sufficient progress determination points us in the same direction. As this court stated in *T. L.*, "a change in permanent plan from return to parent to either guardianship or [another planned permanent living arrangement] marks a profound change of course in the path to finality for children in care." 358 Or at 692. That is so because it "divests the parent of family reunification services as a matter of right from that time forward," *id.* at 691, insofar as, after a permanency plan changes from reunification to guardianship, "the parent's status as the preferred placement for the child is effectively terminated, unless and until the plan is changed at a subsequent permanency hearing," *id.* at 693. The court in *T. L.* further noted that, "[a]lthough that consequence is not so drastic as the termination of parental rights, the magnitude of deprivation—including the potentially permanent denial to a parent of custody and care of children—nevertheless is grave." *Id.* at 693. The nature of the competing interests at stake, as well as text and context calling for the application of a legal standard, persuade us that the juvenile court's "determination" of sufficient progress is a legal conclusion that this court reviews for errors of law.

At the same time, we recognize that the sufficient-progress determination, although ultimately a legal conclusion, is heavily fact-driven. In *N. P.*, the Court of

Appeals ably explained how an appellate court should apply the error-of-law standard of review in evaluating whether the juvenile court has erred in making a similarly fact-driven, statutorily prescribed determination. As noted, the issue in *N. P.* was whether the juvenile court's dependency jurisdiction over the child should continue. Under ORS 419B.100(1)(c), resolution of that issue depended on the juvenile court's determination whether the child's "condition or circumstances [were] such as to endanger the welfare of the person or others." In explaining how it would apply the error-of-law standard of review to the juvenile court's determination, the Court of Appeals stated:

> "Our non-*de novo* review of such a determination is analogous to the deferential review of other factually predicated determinations that are, ultimately, circumscribed by limits of 'matter of law' sufficiency, for example, denials of motions for directed verdict or motions for judgment of acquittal. That is, we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome. Specifically, with respect to a juvenile court's determination under ORS 419B.100(1)(c), we: (1) assume the correctness of the juvenile court's explicit findings of historical fact if these findings are supported by any evidence in the record; (2) further assume that, if the juvenile court did not explicitly resolve a disputed issue of material fact and it could have reached the disposition that it reached only if it resolved that issue in one way, the court implicitly resolved the issue consistently with that disposition; and (3) assess whether the combination of (1) and (2), along with nonspeculative inferences, was legally sufficient to permit the trial court to determine that ORS 419B.100(1)(c) was satisfied.

> "We emphasize that our non-*de novo* appellate review function does not allow us to substitute our assessment of the persuasiveness of the evidence for the juvenile court's, nor does it allow us to revisit the juvenile court's resolution of factual disputes or its choice among reasonable inferences. Rather, as (again) with our review of rulings on motions for directed verdicts or motions for judgment of acquittal, our function is limited to determining whether the evidence was sufficient to permit the challenged determination."

257 Or App at 639-40. Because a juvenile court's determination that a child's conditions or circumstances are such as to "endanger" the child's welfare is comparable to the "sufficient progress" determination that is at issue here, we believe that the Court of Appeals' approach in *N. P.* was correct and equally applicable to our review of the juvenile court's determination of whether a parent has made "sufficient progress" under ORS 419B.476(2)(a). Accordingly, we adopt it here.

To summarize, then, in reviewing a juvenile court's determination to change a permanency plan because a parent has not made "sufficient progress" to allow a child to safely return home, appellate courts are bound by the juvenile court's factual findings as to what efforts DHS has made and what actions the parent has taken, so long as there is any evidence in the record to support them, and we assume that the juvenile court found all facts necessary to its ruling, even if it did not do so explicitly. But the juvenile court's determination that a parent has or has not made "sufficient progress" to allow the child to return home safely is a legal conclusion that appellate courts review for errors of law, and they do that by examining whether the facts explicitly and implicitly found by the juvenile court, together with all inferences reasonably drawn from those facts, were legally sufficient to support the juvenile court's determination. We now turn to apply that standard of review here.

## IV.   APPLICATION TO THIS CASE

Mother does not dispute that the evidence in the record was legally sufficient to permit the juvenile court to determine that DHS had made reasonable efforts to make the safe return of A possible. Thus, the primary issue before this court is whether the juvenile court erred in determining that, at the time of the hearing, mother had not made "sufficient progress to make it possible for the ward to safely return home."

As we have discussed, the juvenile court's "sufficient progress" inquiry is to determine whether the parent has ameliorated the conditions or circumstances that led the juvenile court to make the child a ward of the court to the

extent necessary to make possible—with continued services from DHS if necessary—the child's safe return to the parent's care. In this case, the statutory basis for the juvenile court's dependency jurisdiction is that A's "condition or circumstances * * * are such as to endanger the welfare of the [child]," based on the allegations that "mother was convicted of recklessly causing physical injury to A" and that "mother needs the assistance of the court and state to acquire the skills and training necessary to safely parent this child."

Here, the juvenile court principally based its determination that mother had not made sufficient progress in alleviating the basis for the court's dependency jurisdiction, and, specifically, the allegations set out in the dependency petition, on the following findings: (1) mother was unwilling to accept that her actions had led to A's removal and re-removal, and she failed to acknowledge her role in his broken arm or the gravity of tying up A with a jump rope; (2) mother was unable to put the parenting lessons that she had learned into practice; (3) mother failed or was unwilling to address in therapy the past traumas that provoked inappropriate responses in her to A's behavior; (4) mother chose to lock herself away from A or turn her back on him and ignore him when she felt unable to cope with his behavior or his demands; (5) mother failed to understand why it would be unsafe and unwise for her to permit the grandmother to have contact with and responsibility for her child; and (6), according to Cook, it would take mother another one to two years of therapy and training to become a minimally adequate parent.

Mother does not dispute that those findings are supported by evidence in the record. Rather, she points to testimony at the hearing by Rutherford, her caseworker, suggesting that A's safety could not be ensured without a full-time, live-in safety service provider, and by Hummer, a parenting coach, expressing concerns for A's safety when mother is unsupervised. Mother contends that Rutherford's and Hummer's testimony seemed to reflect an unachievable standard: that, if A's safety cannot be guaranteed, then the parent necessarily has not made sufficient progress. Moreover, she argues, the juvenile court seemed to rely, at

least in part, on its finding that mother was "triggered" by A's normal, age-appropriate behaviors to bolster its conclusion that A's safety could not be ensured. She contends that there was no evidence in the record that episodes in which she had felt "triggered" showed a pattern of violence or otherwise demonstrated a safety threat to A to support a determination of insufficient progress. In sum, mother argues, the facts that the juvenile court set out in its ruling and on which it relied are insufficient as a matter of law to support the juvenile court's determination that her progress was insufficient, particularly given that many—if not all—of the witnesses at the hearing testified that mother had made significant progress, especially after A's re-removal in September 2021.

We see nothing in the juvenile court's ruling that suggests that the juvenile court's insufficient progress determination was based on a finding that A's safety could not be guaranteed or ensured. Moreover, evidence in the record supported the juvenile court's findings that mother continued to be triggered by A's behavior, that mother had not adequately addressed her trauma triggers in therapy, that she had reacted in the past with physical discipline when she was overwhelmed and stressed and frustrated, and that she did not recognize that her approach to physical discipline in the past was something that was harmful to A. The juvenile court reasonably could infer from that evidence that mother might react in an extreme way that endangers A. Thus, even though mother had not reacted violently toward A in the months before the permanency hearing, the juvenile court reasonably could infer from evidence in the record that, if mother were confronted with situations that triggered her when she was alone with A, without the support of a safety service provider, she might react in a more extreme way than she would when there was supervision, including resorting to physical violence, and A would not be safe in her care.

In reaching that conclusion, we are not unmindful of the growing body of data and social science research that mother has cited regarding the potential for bias in DHS's treatment of families of color, as hers is, which can lead to

skewed assessment measures and disparate interventions in state child-welfare systems. Cook recognized as much and sought to avoid such effects in mother's case, advising DHS "to pay attention to possible racial issues." However, even Cook estimated that mother would need one to two years, from the date of his October 2021 evaluation, of additional DHS services, including regular therapy and classes to address her post-traumatic stress, her reactivity to A's behavior, and her lack of parenting skills. That testimony supported the juvenile court's determination that A could not safely be returned to mother's care within a reasonable time.

To be sure, there is evidence in the record that, in the months before the permanency hearing, mother had engaged willingly and eagerly in the services DHS had provided her and that she had made some meaningful progress.[10] Ultimately, however, the juvenile court's "sufficient progress" inquiry is explicitly centered on whether the articulated bases for dependency jurisdiction have been sufficiently ameliorated so that "the ward [may] safely return home," a determination that the juvenile court was required to make with "the ward's health and safety [as its] paramount concerns." ORS 419B.476(2)(a). What matters under ORS 419B.476(2)(a) is whether the parent has made sufficient progress, as a result of those services or otherwise, to overcome the concerns that gave rise to juvenile court's dependency jurisdiction to the extent that it would be possible for the ward to safely return home, with or without continued DHS services and support.[11] Here, we conclude

---

[10] Irwin, for example, submitted a report stating that mother had been making real progress in acquiring parenting skills, and, at the time of the hearing, A was compliant with mother's requests 95 percent of the time. Rutherford testified that, in the previous six to eight months, he had observed improvements in the attachment and bond between mother and A; he had observed more warmth and genuine feeling. Dean testified that mother's ability to take criticism was improving, and Keiser noted improvement in mother's ability to interact and play with A, and in her responsiveness to parenting instruction.

[11] Under ORS 419B.476, DHS's goal in providing services is to make reunification possible. In cases in which the parent actively participates in and successfully completes the services offered yet still is determined not to have made sufficient progress to make possible the child's safe return home, the question may arise whether the services offered were reasonably aligned with the family's needs to effectuate the goal of reunification. That issue is not presented here, however, as mother does not challenge the reasonableness of DHS's efforts to help the family achieve reunification.

that the facts found by the juvenile court were legally sufficient to support the juvenile court's determination that mother had not made sufficient progress to make possible the safe return of A, either at the time of the hearing or within a reasonable time thereafter, and to support its decision to change the permanency plan from reunification to guardianship.[12]

The decision of the Court of Appeals and the judgment of the juvenile court are affirmed.

---

[12] We also reject mother's contention that the juvenile court's statement, in its oral ruling, that it "cannot conclude [mother] has ameliorated the basis for jurisdiction such that [A] could return home within a reasonable time" shows that the juvenile court applied an incorrect standard in making its determination of insufficient progress. In context, that statement does not reflect a misapplication of the correct legal standard for a change in permanency plan; rather, it is better understood to reflect the court's determination that mother had not made sufficient progress to make it safe for A to return home. Viewed as a whole, the court's statement of its findings of fact and conclusions of law reflects that the court understood the nature of the determination it was to make under ORS 419B.476.